UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CONMED CORPORATION,

                    Petitioner,

          vs.                                             Civil Action No.  6:21-CV-1245 BKS

FIRST CHOICE PROSTHETIC & ORTHOPEDIC
SERVICE, INC.,

                    Respondent.

**MEMORANDUM OF LAW
IN SUPPORT OF PETITION TO VACATE AN ARBITRATION AWARD**

HANCOCK ESTABROOK LLP
John G. Powers, Esq. (508934)
Mary L. D'Agostino, Esq. (520301)
1800 AXA Tower I
100 Madison St.
Syracuse, NY 13202
(315) 565-4500

COUNSEL FOR PETITIONER CONMED CORPORATION

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

RELEVANT PROCEDURAL AND FACTUAL BACKGROUND .........................1

   THE FACTUAL RECORD AT THE ARBITRATION ..................................................2

     First Choice's habitual non-payment for shipped product ....................................2

     First Choice bounced or cancelled payment on checks after product shipped......................3

     First Choice lack of integrity within the distribution relationship ........................3

     First Choice's poor sales performance ..................................................................4

     Customer Complaints about First Choice ..............................................................6

   THE ARBITRATOR'S DETERMINATIONS ...........................................................6

     The Choice-of-Law Decision ...............................................................................6

     The Final Award ...................................................................................................7

ARGUMENT..........................................................................................................9

   POINT I – THE ARBITRATOR'S DECISION REGARDING CHOICE OF LAW
   EXCEEDS HIS POWERS UNDER THE ARBITRATION CLAUSE ...................10

   POINT II – THE ARBITRATOR'S FINAL AWARD WAS BASED ON A
   MANIFEST DISREGARD FOR CLEAR AND EXPLICITLY
   APPLICABLE LAW..............................................................................................15

     Application of Puerto Rican law to the dispute manifestly disregarded the law ..............16

     Finding that the 2019 SAL was a release was a manifest disregard of the law ...............18

     By excusing the existence of "just cause" for non-payment because of a
     Subsequent payment plan, the Arbitrator acted in manifest disregard for the law ...........21

     The breach of the payment plan was a separate actionable instance of just cause ..........25

CONCLUSION .....................................................................................................26

## PRELIMINARY STATEMENT

Conmed Corporation ("Conmed") petitions the Court to vacate two arbitration determinations associated with its July 2021 arbitration (the "Arbitration") with Respondent First Choice Prosthetic & Orthopedic Service, Inc. ("First Choice"), a Puerto Rican distributor.

The Arbitrator's[1] determination as to which substantive law should apply to the Arbitration (the "*Choice-of-Law Decision*") should be vacated under 9 U.S.C. § 10(a)(4) because the Arbitrator ignored the parties' contractual agreement requiring the arbitration itself to be conducted according to New York law, and applied Puerto Rican law instead. In addition, the final award of the Arbitrator (the "*Final Award*") should be also vacated under 9 U.S.C. § 10 because the Arbitrator's findings that Conmed had released (or excused) First Choice's undisputed breaches ignored explicitly applicable legal authority—of which the Arbitrator was expressly made aware prior to his issue of the *Final Award*. Because on the whole the Arbitrator strayed from the valid and clear "interpretation and application of the [governing] agreement and effectively 'dispense[d] his own brand of industrial justice'" his determinations should be vacated. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

## RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

Conmed is a medical device manufacturer, formerly headquartered in Utica, New York, engaged in the manufacture, distribution, and sale of a variety of medical devices, products, and instruments, both in the United States and abroad. Ver. Pet. ¶ 1. Since approximately 2015, Conmed sold a certain limited subset of its products in Puerto Rico through a distribution relationship with First Choice. *Id*. at ¶¶ 2–3.

For a portion of the parties' commercial relationship, the parties had written agreements,

---

[1] As referred to herein, the "Arbitrator" shall refer to the arbitrator, David C. Singer, Esq. *See* Ver. Pet. ¶ 8.

referred to as Sales Authorization Letters ("SALs"), containing terms and conditions governing the contractual relationship. *See id.* at ¶ 3, Exs. A, B. Also, First Choice's purchase of Conmed product was governed by written purchase orders and invoices, requiring payment for product within 90 days of the invoice. *See* Ex. A at 1; Ex. N at ¶¶ 11, 16.

### THE FACTUAL RECORD AT THE ARBITRATION
#### *First Choice's habitual non-payment for shipped product*

Throughout the parties' distribution relationship, First Choice repeatedly failed to pay for Conmed's products in a timely manner and in some cases did not *ever* pay for a significant quantity of shipped Conmed product and equipment it ordered. Ex. N at ¶ 19. For example:

- As of August of 2016, there were at least 52 First Choice invoices past due, with 29 invoices more than 50 days late and nine invoices more than 100 days late;
- As of September of 2016, there were at least 65 First Choice invoices past due, with 46 invoices more than 50 days late and 25 invoices more than 100 days late;
- As of October of 2016, there was $407,448.84 in invoices over 91 days past due; and
- As of April of 2018, there was $443,804.15 in invoices over 91 days past due.

Ex. N at ¶ 20; Arb. Ex. 8.[2] As of the date of the Arbitration hearing in July of 2021, 64 invoices issued to First Choice for shipped product between February 3, 2017 and October 10, 2017, totaling $159,742.96, *still remained unpaid.* Ex. N at ¶ 22, Arb. Ex. 9.

In late 2018, because of the repeated and lengthy failures to pay for product on time, Conmed was forced to implement a policy of not shipping product to First Choice until the company had paid "up front" for Conmed's products. Ex. N at ¶ 26. That change in policy was memorialized in a December 20, 2018 SAL (the "2019 SAL")[3] signed by First Choice's President, Mario Garcia. *See* Ex. B at p. 2. The 2019 SAL also set forth a payment plan for First

---

[2] "Arb. Ex." shall refer to those exhibits that are annexed to the Affidavit of Andreea Teodorescu. *See* Ex. N.
[3] The 2019 SAL is also referred to as the "2018 SAL" in the parties' papers. *See generally* Exh. B.

Choice, requiring it to pay $6,000 before the 15th of the month toward its arrearage, which at that time was approximately $325,000. *See* Ex. B. The 2019 SAL provided that the failure to make any $6,000 monthly payment permitted Conmed to "immediately terminate." *See* Ex. B.

At the Arbitration, Conmed presented undisputed evidence that First Choice failed to meet the repayment requirements of the 2019 SAL almost immediately in January of 2019. *See* Ex. N at ¶ 35, Arb. Ex. 12. In 2020, First Choice also began to miss the contractually required debt payments beginning in March, but was also short in the months of May, August, September, October, November, and December. *See* Ex. N at ¶ 38. First Choice made no payment at all in the month of July 2020. *Id.* Conmed initiated this Arbitration in November 2020. *See* Ex. C.

### *First Choice bounced or cancelled payment on checks after product shipped*

In the Arbitration, Conmed presented undisputed evidence that First Choice bounced multiple checks between 2017–2020 to secure shipment of product. *See* Ex. N at ¶¶ 26-30; Ex. 3.

| First Choice Purchase Order # | Amount | Year check bounced/stop/payment |
|---|---|---|
| #911 | $4,452.88 | 2017 |
| #912 | $3,187.28 | 2017 |
| #934 | $4,452.88 | 2017 |
| #1000642 | $6,693.26 | 2017 |
| #1000642 | $536.40 | 2017 |
| #1000642 | $410.50 | 2017 |
| #198 | $5,787.91 | 2018 |
| #3097 | $3,918.95 | 2020 |

On *multiple* occasions after Conmed would request payment up front, First Choice would—in order to induce a shipment of product—provide Conmed advance payment by check, which would later bounce. *See* Ex. N at ¶ 27. Worse yet, on *multiple* occasions First Choice sent a check to Conmed to induce the release product and then instructed its bank to "stop payment" on the check. Tr. [Ex. P] at 167, lns. 3-17; *see also See* Ex. N at ¶ 27.

### *First Choice lack of integrity within the distribution relationship*

Aside from First Choice's lack of reliability in making payment, the record also

evidences material dishonesty with respect to the sale of Conmed's product within Puerto Rico. *See* Ex. N at ¶¶ 53-75. For example, in conjunction with its authorization to sell "Advanced (2D) Visualization System" equipment in the 2014 SAL, First Choice ordered for four advanced digital arthroscopic monitoring "video towers". *See* Ex. N at ¶¶ 53-54. The video towers were shipped and invoiced to First Choice by Conmed in 2015 and 2016 for $192,876.73. *See* Ex. N at ¶ 55. But First Choice *never* paid for this equipment. *See id* at ¶ 56; Tr. [Ex. P.] at 311, lns. 9-14.

As an excuse for the non-payment, Mr. Garcia falsely represented to Conmed that First Choice was unable to sell any of the tower equipment. *See* Ex. N at ¶ 56; Tr. [Ex. P] at 223, lns. 7-11; Tr. at 137, lns. 15-25; Tr. at 138, lns. 1-22. In 2019, Conmed later learned, however, that Bella Vista Hospital had actually purchased two of the towers from First Choice *in 2015 and early 2017—well before* Mr. Garcia represented they were unsold. *See* Ex. N at ¶¶ 65, 67; Arb. Ex. 21. Conmed learned that it could not trust the representations of its distributor.

<u>*First Choice's poor sales performance*</u>

The factual record in the Arbitration also demonstrated that First Choice's sales had steadily declined over the seven years of the parties' commercial relationship:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021* |
|------|------|------|------|------|------|------|-------|
| Aggregate Sales | $454,568.58 | $314,641.50 | $391,954.04 | $262,120.83 | $178,983.90 | $153,174.21 | $87,369.27 |

*through May 2021



See Ex. N at ¶ 51, Arb. Ex. 17. While First Choice attempted to blame this performance on

Hurricane Maria in September of 2017, earthquakes in December of 2019, and COVID-19, these excuses did not explain First Choice's abysmal performance in 2018 and 2019, which would have been unaffected by these events. Ex. Q at pp. 22–24:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021* |
|------|------|------|------|------|------|------|-------|
| Aggregate Sales | $454,568.58 | $314,641.50 | $391,954.04 | $262,120.83 | $178,983.90 | $153,174.21 | $87,369.27 |

*through May 2021

In fact, if the 2017 and 2020 sales numbers are *excluded* on account of First Choice's purported excuses based on Covid and natural disasters, the sales performance trend for 2015, 2016, 2018, and 2019 is even more dismal.



Conmed also further refuted this excuse by providing evidence of the performance of its *other* Puerto Rican surgical distributors. *See* Ex. N at ¶ 52; Arb. Ex. 18; Tr. [Ex. P] at 146, ln. 25; Tr. at 147, lns. 1-25; Tr. at 148, lns. 1-25; Tr. at 149, lns. 1-10. Those distributors *also* experienced Hurricane Maria, earthquakes, and COVID-19, and operated under the same l restrictions and practical limitations as First Choice. *See id*. Accounting for the different prices and products through a compound annual growth rate ("CAGR") calculation, the comparative sales trends of those other Puerto Rican distributors showed a markedly better response and resiliency to the natural disasters during the same period of time:



*See* Ex. N at ¶ 52; Ex. 18.

### *Customer complaints about First Choice*

The factual record at Arbitration also included evidence of complaints received by Conmed about the level of service provided by First Choice. *See* Ex. N at ¶¶ 75-82; Tr. [Ex. P] at 9-13, Ex. 22. For example, one customer, Auxilio Mutuo Hospital, refused to do business with First Choice because it was dissatisfied the service. *See id.*; Tr. at 12 -13, Ex. 22; Tr. at 244, lns. 18-25. But when Conmed proposed that it would directly service the customer and then credit First Choice, Mr. Garcia nonetheless refused. *See* Ex. N at ¶¶ 77-81, Arb. Exs. 22 & 23; Tr. [Ex. P] at 37-39. As a result, Conmed has not been able to make any Sports Medicine sales to Auxilio Mutuo Hospital, losing the hospital as a customer. *See* Ex. N at ¶ 82; Tr. [Ex. P] at 38, lns. 17-25; Tr. at 39, lns. 1-25; Tr. at 40, lns. 1-8.

## THE ARBITRATOR'S DETERMINATIONS
### *The Choice-of-Law Decision*

Prior to the hearing, the parties disputed which substantive law should govern the dispute. Ver. Pet. ¶ 18. By virtue of the parties' contract—*i.e.*, the 2019 SAL, which stated that "*any arbitration hereunder[] shall apply the laws of the State of New York*"—Conmed took the position that the parties' arbitration agreement ("Arbitration Clause") and the Federal Arbitration

Act ("FAA") *required* the dispute to be arbitrated according to New York law. Ver. Pet. ¶ 19. First Choice took the position that public policy concerns embedded in Puerto Rican state law required that the Arbitrator apply Puerto Rican law to the resolve the dispute. Ver. Pet. ¶ 19.

The decision regarding the choice of law mattered because Puerto Rican law includes a statute—Puerto Rico's Dealer Protection Act ("Law 75")—that alters ordinary contract rules in a manner that protect Puerto Rican distributors to the detriment of mainland suppliers. Ver. Pet. ¶ 20. Because of the difference in the law, the choice-of-law dispute between the parties would potentially have a dispositive impact on the outcome of the arbitration. Ver. Pet. ¶ 21.

The Arbitrator issued his written decision on this issue on June 30, 2021 (the "*Choice-of-Law Decision*"), holding that the arbitration would be conducted according to Puerto Rican law. *See* Ex. E. In the *Choice-of-Law Decision*, the Arbitrator ignored the express language of the parties' arbitration agreement. The decision failed to follow controlling case law from the United States Supreme Court holding that the FAA preempts contradictory state law and *requires* arbitrator enforcement of agreements that set the "ground rules" for arbitration, including those that specify which law would be applied during the arbitration. *See* Ex. "E"; *see also* Exs. G & I.

For the reasons stated below, the *Choice-of-Law Decision* should be vacated because the Arbitrator exceeded his contractual authority by ignoring the contractual directive that the arbitration be conducted according to New York law.

### *The Final Award*

After the *Choice-of-Law Decision*, the parties submitted evidence for the Arbitration through party-witness Declarations and Affidavits, with incorporated exhibits. Ver. Pet. ¶¶ 29–31, Exs. N, O. The witnesses also testified at a virtual hearing over three days on July 27, 28, and 30, 2021. Ver. Pet. ¶ 32, Ex. P. The parties then submitted post-hearing briefing marshalling the

facts and the governing law regarding the disputed issues. Ver. Pet. ¶ 33; Exs. Q–T.

Notwithstanding its position that New York law should apply to the dispute, Conmed took the position, based on relevant First Circuit and Puerto Rican authority, that that each of the categories of conduct described above supported a finding that "just cause" existed to terminate the distributorship without penalty under Puerto Rico's Law 75. *See* Ex. Q.

The Arbitrator issued his final award on November 10, 2021 (the "*Final Award*"). *See* Ex. F. In the *Final Award*, the Arbitrator made a factual finding that First Choice had failed to timely pay Conmed for products that it had purchased. *See* Ex. F at 4 ("<u>Over time, First Choice did not pay for Products that it purchased for Conmed</u>.") (emphasis added). In fact, the Arbitrator correctly found, as a matter of fact, that by September 30, 2018, that "<u>First Choice owed Conmed $443,804.15 for Products that it had purchased</u>." *See* Ex. F at 4 (emphasis added). The Arbitrator agreed that the lack of timely payment for product constituted "just cause" under Law 75. *See* Ex. F at 9 ("Puerto Rico's Law 75 also provides that failure to pay for product received constitutes just cause for termination of a distribution agreement."). The Arbitrator *also* acknowledged receipt of evidence regarding "lack of honesty and integrity" by First Choice, bounced checks, and customer dissatisfaction. *See* Ex. F at 7–8.

Yet, notwithstanding the undisputed evidence presented by Conmed of the above commercial conduct by First Choice and applicable authority establishing that such conduct— including non-payment for product—constitute "just cause" under Law 75, the Arbitrator concluded that there was not "just cause" based on his legal finding that "*these issues … are not determinative in this arbitration*" because they arose *prior to the 2019 SAL. See* Ex. F at 8 (emphasis added). Specifically, the Arbitrator found that by the parties executing the 2019 SAL (effective December 20, 2018) that all "previously unresolved issues" were "resolved." *See* Ex. F

at 9. In other words, the Arbitrator, as a matter of law, interpreted the 2019 SAL as a "release" that excused or extinguished any antecedent breaches or just cause—including hundreds of prior examples of late payment or non-payment for Conmed product. *See* Ex. F at 8–9.

The Arbitrator further found, as a matter of law, that because Conmed had agreed to a payment plan to allow First Choice to pay down the money it owed as a result of its breach of the distribution agreements' obligations to pay for product, any "just cause" created by the non-payment was cured or excused. *See* Ex. F. at 10. Finally, even after finding the payment plan in the 2019 SAL was violated by First Choice, the Arbitrator still found that no just cause existed to terminate the distributorship.

For the reasons stated below, these findings should be vacated as being in manifest disregard of clear, controlling, and explicitly applicable law. While the Arbitrator *did* make factual errors, those errors are *not* the subject of this Petition, which assumes the correctness of the Arbitrator's factual determinations.

## ARGUMENT

The FAA's "central purpose" is "to ensure 'that private agreements to arbitrate are enforced according to their terms.'" *Mastrobuono v. Shearson Lehman Hutton, Inc*. 514 U.S. 52, 53-54 (1995). Section 10 of the FAA enumerates the statutory grounds that permit a district court to vacate an arbitral award. *See* 9 U.S.C. § 10.

Grounds for vacatur include: "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators ...; (3) where the arbitrators were guilty of misconduct ...; or (4) where the arbitrators exceeded their powers[.]" 9 U.S.C. § 10(a)(1)-(4). In addition, a court may *also* vacate an arbitration award where the arbitrator has manifestly disregarded the law. *Halligan v. Piper Jaffray, Inc.*, 148 F.3d

197, 202 (2d Cir. 1998); *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) ("an arbitration award may be vacated if it exhibits a manifest disregard of the law.").

Although judicial review of an arbitral award under the FAA is ordinarily highly deferential, courts have clear authority in cases, just like this, to vacate an arbitral award. *See, e.g., StoltNielsen SA v. AnimalFeeds Int'l Corp*., 548 F.3d 85, 90 (2d Cir. 2008)[4] (reversing district court where arbitrators' award was made in "manifest disregard" of law); *Halligan,* 148 F.3d 197 (manifest disregard of law existed where challenging party adequately briefed arbitrator on age discrimination issue, the award failed to explain the basis for the award, and the overwhelming evidence indicated that the arbitrators had disregarded both law and evidence in finding no age discrimination); *New York Telephone Co. v. Comm's Work' of Amer. Local 100, AFL-CIO. Dist. One,* 256 F.3d 89 (2d Cir. 2001) (arbitration award made with manifest disregard where arbitrator disregarded binding circuit precedent in favor of applying out-of-circuit law).

## POINT I

### THE ARBITRATOR'S DECISION REGARDING CHOICE OF LAW EXCEEDED HIS POWERS UNDER THE ARBITRATION CLAUSE

As stated, the Arbitrator held—notwithstanding the parties' agreement that the Arbitration "shall" apply New York law—that he would, instead, apply Puerto Rican law. *Compare* Ex. B *with* Ex. E. In his *Choice-of-Law Decision*, the Arbitrator found that the strong public policy imbued in Puerto Rican Law 75, which mandated that any contractual choice of law be deemed void, outweighed any countervailing policy that the State of New York might have regarding the dispute. *See* Ex. E at pp. 2–3. The decision then proceeded to apply a conventional choice-of-law analysis as between New York and Puerto Rico. *See id*. at 3. The Arbitrator's decision addressed the choice-of-law provision in the contract, but *only* as a generic

---

[4] *rev'd other grounds* 130 S. Ct. 1758 (2010) (panel exceeded its powers by imposing its own policy choice)

choice-of-law provision—not as a requirement governing the arbitration itself. *See id*. To the extent the Arbitrator even considered the FAA, he found that the FAA did not pre-empt Puerto Rican law because the parties "cannot insulate themselves from [Law 75's cancellation of choice-of-law provisions] through the inclusion of an arbitration clause in an agreement." *Id.* at 4. This finding by the Arbitrator—that he was not obligated to enforce the parties' agreement that the Arbitration would be conducted under New York law—exceeded his powers under the governing agreement and violated well-settled FAA pre-emption rules.

An arbitrator exceeds his/her authority by issuing an arbitral award that "contradicts an express and unambiguous term of the contract." *Westerbeke Corp. v. Daihatsu Mot. Co.*, 304 F.3d 200, 222 (2d Cir. 2002). In *Stolt-Nielsen S.A.*, the Supreme Court confirmed the applicability of this principle to petitions for vacatur under the FAA, stating that "[w]hen [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' his decision may be unenforceable." 559 U.S. at 671. Here, the Arbitrator impermissibly contradicted the parties' contract *and* violated the law.

*First*, as a general matter, contractual provisions specifying the ground rules under which an arbitration will be conducted are specifically enforceable under the FAA. This is the pivotal holding of *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, where the Supreme Court linked a California choice-of-law provision to a separate contractual provision requiring arbitration of disputes. 489 U.S. 468, 470 (1989). The Court held that a separate choice-of-law provision was a way for parties to "specify *by contract* the rules under which that arbitration will be conducted" and, in particular, the law that would govern the arbitration. *Id.* at 479 (emphasis added). The Supreme Court would go on to hold that contractual provisions mandating arbitration must also be harmonized and *read together* with separate New York

choice-of-law provisions to mean, for example, that an ensuing arbitration would also necessarily "encompass substantive principles that New York courts would apply . . . ." *Preston v. Ferrer*, 552 U.S. 346, 362 (2008) (explaining *Mastrobuono* and the required harmonization between arbitration agreements and choice-of-law agreements); *Mastrobuono*, 514 U.S. 52 (concluding that choice-of-law provision must be harmonized with arbitration provisions).

Here, it cannot be argued that the choice-of-law provision in the governing contract was *separate* from the contract's arbitration provision. *See* Ex B. In other words, what was implied in *Volt*, *Mastrobuono*, and *Preston* regarding the interconnection between an arbitration provision and a separate choice-of-law provision, *is made express* in the contract at issue. *See id.* Here, the choice-of-law provision at issue *expressly references the arbitration* and indicates that the arbitration *itself* will "apply" New York law. *Id.* Thus, contrary to the Arbitrator's implication that the contract contains a garden-variety choice-of-law provision, the provision here is *not* separate from the arbitration provision. It, in fact, *expressly* limits *the manner in which* the arbitration will be conducted. *See id.* Such agreements regarding the ground rules for arbitration must be enforced under the FAA as provided for by *Volt*, and its progeny.

*Second*, the *Choice-of-Law Decision* held that where the arbitration agreement conflicted with the policy imbued in a state statutory prohibition, that the state statute—here Law 75— outweighed the parties' agreement as to how the arbitration would be conducted. In other words, the Arbitrator found that the requirements of Law 75, driven by Puerto Rican public policy, trumped the parties' agreement that the arbitration should "apply" by New York law. This finding is unmistakably contradicted by the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

At issue in *Concepcion* was a directly analogous question—could the strong public policy

behind California's prohibition against class action waivers trump a party's private agreement to arbitrate according to a procedure that would contradict and deny that statutory right? In *Concepcion,* customers of AT&T brought a class action lawsuit, which alleged that the company's offer of a free phone to anyone who signed up for its cellphone service was fraudulent. The customers' purchase agreements, however, all contained mandatory arbitration provisions that expressly specified a certain ground rule for the arbitration—*i.e.*, that any arbitration would be "individual capacity" only and could not be brought in a collective or class action form. *Id*. at 336. Following the initiation of suit, AT&T moved to compel arbitration. The customers opposed and argued that the purchase agreements' arbitration clause barring a class action form—*i.e.*, specifying a ground rule for the arbitration—violated the strong public policy imbued in California's prohibition of class action waivers. *Id*. at 387-88.

Thus, the customers' contentions in *Concepcion* are a direct analog to Arbitrator's finding in this arbitration. Specifically, like the customers in *Concepcion*, the Arbitrator concluded that contractual ground rules set by the parties in their contract—*i.e.*, that New York law would apply in the arbitration itself—would violate the public policy behind Law 75, which was intended to protect Puerto Rican distributors from contractual choice-of-law determinations derived from a lack of bargaining power.

However, this premise was soundly *rejected* by *Concepcion*. The Supreme Court ruled that, regardless of the policy implications, California's class action waiver prohibition was *preempted* by the FAA. *See Concepcion*, 563 U.S. at 343. The Court held that contractual arbitration provisions could *not* be deemed unenforceable based on any state law that prohibited, obstructed, or otherwise impaired the contractual right to arbitrate *or* the related contractual right to choose *how* the arbitration will be conducted. *Id*. at 341-42. The Court gave examples of how

various types of state rules that would require certain types of discovery, application of specific rules of evidence, or guarantee a right to a jury could all be argued to render an agreement to arbitrate unconscionable for public policy reasons. *Id*. 342-43.

In resolving this conflict, the Court equated the FAA's protection of arbitration agreements themselves with the required, corresponding protection over agreements dictating *how* an arbitration was to be conducted. *Concepcion*, 563 U.S. at 344. As a result, the Court observed that the FAA requires arbitration to be compelled "in accordance with the terms of the agreement" including such things as any agreement to limit the issues being arbitrated, agreement as to the specific substantive rules governing the arbitration, or agreements limiting the parties to the arbitration. *See id*. at 344-45. For example, the customers in *Concepcion* argued that allowing for a class action procedure would not necessarily be incompatible with the right to arbitrate in general because the Court could mandate a class action arbitration, and thus the Court need not find the California rule in conflict with the FAA. *See id*. at 351. Showing the breadth of the FAA's preemptive sweep, the Court rejected this contention, finding that the FAA applies equally to protect "parties' expectations" regarding *how* the arbitration would be conducted. *Id*.

The *Concepcion* case reveals the fundamental flaw with Arbitrator's *Choice-of-Law Decision*. That is, Puerto Rican public policy does not exist as an unbalanced force to be considered in a vacuum when determining whether to invalidate the parties' choice-of-law agreement. Rather, the choice-of-law provision at issue *mandates* that the arbitration itself will be conducted under New York law. Application of Law 75 would undeniably thwart the parties' agreement as to *how* this arbitration was to be conducted. As a result, the Respondent's argued application of Law 75 *directly* conflicts with the application of the FAA. But as is set forth in *Concepcion*, and the cases that it cites, where state law would purport to restrict *the manner in*

*which* parties choose to arbitrate, it is preempted by the FAA, inapplicable, and unenforceable in arbitration.[5] *See Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (noting that the "courts must 'rigorously enforce' arbitration agreements according to their terms . . . [including] 'the rules under which that arbitration will be conducted'"); *c.f. Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004) (respecting "the parties' choice of law is fully consistent with the purposes of the FAA" and "honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping"). Hence, when state law conflicts with the FAA, state law gives way.

Here, the Law 75 provision purporting to void the choice-of-law provision was preempted by the FAA under *Concepcion*. By ignoring this clear law, and the explicit language of the contract governing how the Arbitration was to be conducted, the Arbitrator exceeded his powers and, thus, his *Choice-of-Law Decision* must be vacated. The Second Circuit has held that there is "*no clearer example*" of an arbitrator exceeding his power under 9 U.S.C. § 10(a)(4) than one who disregards a choice-of-law provision that controls the conduct of an arbitration. *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991) (vacating arbitrator's award under to 9 U.S.C. § 10(a)(4) for exceeding his powers where he ignored a New York choice-of-law provision and entered relief prohibited by that state's substantive law) (emphasis added).

## POINT II

### THE ARBITRATOR'S *FINAL AWARD* WAS BASED ON A MANIFEST DISREGARD FOR CLEAR AND EXPLICITLY APPLICABLE LAW

The Arbitrator's *Final Award* should be vacated as a manifest disregard for the applicable law. First, his application of Puerto Rican law to the parties' dispute ignored the clear governing

---

[5] Thus, even where a state law doctrine is thought to be generally applicable, if the doctrine "interferes with fundamental attributes of [the] arbitration" it "thus creates a scheme inconsistent with the FAA," and is preempted. *Concepcion*, 563 U.S. at 344.

law set forth above—holding that the parties' contractual agreement to apply New York law to the arbitration must be enforced—which resulted in an erroneous outcome. Second, even assuming Puerto Rican law, the Arbitrator made findings supporting the existence of "just cause" to terminate—but erroneously held that those grounds were *released* by the 2019 SAL, which was plainly *not* a release. Third, the Arbitrator excused just cause to terminate under Puerto Rico law for non-payment based Conmed's implementation of a payment plan—which is contrary to well settled law. Finally, the Arbitrator ignored clearly applicable law by not finding that the subsequent breach of the payment plan was not, in and of itself, just cause.

Manifest disregard "means more than error or misunderstanding with respect to the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). A party seeking vacatur must prove that the arbitrator was fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it. *Id.* at 933. To sustain a manifest disregard challenge, the Court must make three findings: (1) "the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators," (2) "the law was in fact improperly applied, leading to an erroneous outcome," and (3) "the arbitrator ... kn[ew] of its existence, and its applicability to the problem before him." *Duferco Int'l Steel Trading v. T. Klaveness Ship. A/S*, 333 F.3d 383, 390 (2d Cir. 2003).

<u>Application of Puerto Rican law to the dispute manifestly disregarded the law</u>

As set forth above, the strong policy imbued in the FAA mandates that arbitrators apply the contractual limitations set by the parties on the conduct of the Arbitration. Here, it is undisputed that Arbitration Clause required the Arbitration "apply" New York law. *See* Ex. B at 3 ("any arbitration hereunder *shall* apply[] the laws of the State of New York" (emphasis added)). As set forth above—and in the lengthy briefing provided to the Arbitrator—well-settled

FAA authority dictates that when the parties' set forth ground rules for arbitration, the FAA trumps (pre-empts) any state law policy contradicting those contractual wishes. Thus, applying the manifest disregard standard, the first question must be answered in the affirmative—the law regarding the issue is clear and definitively applicable to the parties' choice-of law dispute.

The second question asks whether the improperly applied law led to an erroneous outcome. Here, that question must be undoubtedly answered in the affirmative. By applying Puerto Rican law, the Arbitrator imposed a vast protective statutory scheme over the parties' dispute, which required Conmed to demonstrate "just cause" to end an otherwise at-will commercial relationship that it clearly found unsatisfactory. After all, the 2019 SAL, which was the last agreement First Choice was willing to sign, defined the term of First Choice's exclusive rights as ending on December 31, 2019. *See* Ex. B at 1. Were New York law to be applied to the what is presently an at-will commercial relationship, Conmed could freely leave the relationship under New York contract law principles without meeting *any* evidentiary burden. *See, e.g., Liberty Imports, Inc. v. Bourguet*, 146 A.D.2d 535, 536 (1st Dep't 1989) ("contracts of exclusive agency and distributorship are terminable at will in the absence of an express provision of duration"). By instead applying Law 75, the Arbitrator has chained Conmed to an unprofitable, and an unsatisfactory, commercial relationship (without any current contractual commitment) that New York law would not condone. Thus, the Arbitrator's mistake on choice of law had an unmistakably profound impact on the substantive issues in dispute, and the ultimate outcome.

Finally, as to the third question, the Arbitrator was placed on clear notice of the choice-of-law dispute, as well as clear notice of the governing legal principles under the FAA that should have controlled the outcome. *See* Exs. G & I. In fact, the application of the FAA was quite literally the main argument advanced by Conmed in its choice-of-law briefing, *see id*.

Under these circumstances, Conmed has met its burden of establishing grounds under 9 U.S.C. § 10 to vacate the arbitration award for manifest disregard of the law for the application of the wrong law to the proceeding. *C.f*, *New York Telephone Co.,* 256 F.3d at 93 (arbitrator was in "manifest disregard of the law" by applying the wrong substantive law to the dispute).

### *Finding that the 2019 SAL was a release was a manifest disregard of the law.*

As set forth above, notwithstanding ample evidence demonstrating that "just cause" existed to terminate, the Arbitrator excused First Choice's conduct and found it had been released by the parties' execution of the 2019 SAL. *See* Ex. F at 8–9 (when the parties executed the 2019 SAL (effective December 20, 2018), all "previously unresolved issues"—*i.e.*, all prior contractual breaches—were "resolved"). In so finding, the Arbitrator seemingly relied on a *contractual integration clause—i.e.*, stating that the SAL was the "entire agreement between the parties" and integrated all "previous discussions, negotiations, and prior agreements"—to mean the same thing as *contractual release* by Conmed of any First Choice liability. *See* Ex. F at 8. With that entirely illogical sleight-of-hand, the Arbitrator avoided having to call First Choice to account for the vast majority of its unsatisfactory contractual performance.

Of course, this finding—that an integration provision is also a release—is palpably wrong under Puerto Rican or New York law. Like most jurisdictions, in order for a release of liability to exist under Puerto Rican law, the release must be stated in "clear, conclusive, and unequivocal" terms and may "not be generally presumed." *Cabrera v. Doval*, 76 P.R.R. 777 (1954) ("[c]lear and explicit language is required in the contract to absolve a person from the consequences of his own neglect"). For a party to be contractually exonerated from the consequences of their own conduct, "the language used in the discharge document must state so clearly and explicitly" … "either expressly referring to the [specific liable act] or stating such intention in no uncertain

terms." *Chico v. Ed. Ponce, Inc.*, 101 P.R. Dec. 759, 778-79 (1973).[6] Releases utilize specific, detailed, and sometimes ritualized language to satisfy this rigid standard.

*Nothing* in the 2019 SAL even remotely suggested a release or waiver of liability had been agreed to. Those specific contractual terms of art—"waiver" or "release"—are not even mentioned in the 2019 SAL. *See* Ex. B. There is no language whatsoever that any reasonable jurist could rely on to find that Conmed was releasing First Choice for prior liability. *See id.* Thus, the first "manifest disregard" element is met—the well-settled and understood legal principles were ignored by the Arbitrator regarding what was needed to find a release.

The second element is met as well—*i.e.*, the Arbitrator's legal mistake changed the outcome. The Arbitrator had correctly found that First Choice habitually failed to pay Conmed on time *and* that failure constituted "just cause" to terminate under the Puerto Rican Law 75. *See* Ex. F at 4, 9 (finding that "[o]ver time, First Choice did not pay for Products that it purchased for Conmed" *and* that "Puerto Rico's Law 75 also provides that failure to pay for product received constitutes just cause for termination of a distribution agreement"). In fact, well-settled Law 75 caselaw provides that the failure to pay for 11 shipments on time constitutes "just cause" to terminate. *PPM Chem. Corp. of P.R. v. Saskatoon Chem. Ltd.*, 931 F.2d 138, 140 (1st Cir. 1991) (the failure to timely pay for eleven shipments of chemicals was just cause to terminate under Law 75). The undisputed record at the Arbitration established hundreds of late payments by First Choice. *See* Ex. Q at 1, 4–10. Thus, the Arbitrator would have been compelled to find just cause under Puerto Rican law but for his erroneous conflation of an integration clause with a release.

---

[6] Under New York law, in order to be a release, a contract must "clearly and unambiguously" release prior liability, identifying the scope and breadth of what is being released and it must do so "with specificity." *Moore v. Cohen*, 19-CV-4977, 2021 WL 2986398, at *8 (S.D.N.Y. July 13, 2021). An integration clause is not a release. *DeBenedictis v. Malta*, 140 A.D.3d 438, 438-39 (1st Dep't 2016) (defendant "failed to establish any waiver, release, or limitation of his fiduciary obligations, simply by virtue of a standard integration clause in the parties' agreement").

Finally, as the third manifest disregard element, the Arbitrator was placed on express notice of this issue, as well as the correct controlling law prior to his issue of the Final Award. *See* Ex. S. Conmed raised this issue specifically with the Arbitrator stating:

> Conmed never released First Choice for those breaches. In order for a release of liability to exist it must be "clear, conclusive, and unequivocal" and may "not be generally presumed" *Cabrera v. Doval*, 76 P.R.R. 777 (1954). For a party to be exonerated in an agreement from the consequences of their own conduct, "the language used in the discharge document must state so clearly and explicitly" and "either expressly referring to the [specific liable act] or stating such intention in no uncertain terms." *Chico v. Ed. Ponce, Inc.*, 101 P.R. Dec. 759, 778-79 (1973).
>
> First Choice cannot point to any writing where Conmed purports to waive or release First Choice from its liability for hundreds of prior breaches of the parties' agreement between 2014–2018.

*Id.* at pp. 3–4.

Thus, the manifest disregard standard is met with respect to this issue as well. The Arbitrator's interpretation of a contract is, of course, a legal finding. While garden-variety contract interpretation mistakes are outside the scope of the "manifest disregard" review, where contract interpretation is egregiously wrong and akin to "chang[ing] the contract" or ignoring the contract as written, manifest disregard may be implicated. *Giller v. Oracle USA, Inc.*, 512 F. App'x 71, 74 (2d Cir. 2013). Thus, where the Arbitrator merely goes through the motions of contract interpretation, and reaches an "outlandish disposition" that is plainly "outside the contract" as written, manifest disregard exists. *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir. 1988) (where the arbitrator "simply by making the right noises—noises of contract interpretation" reaches and "outlandish disposition" and "*must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference, either ...)" his/her decision is subject to vacatur).

Here, the Arbitrator's *ipse dixit* conflation of an integration clause with a release was not even a colorable act of contract interpretation—a violation of the most basic principles of

contract law in order to dispense "his own brand of industrial justice." *Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 509 (2001). Under the circumstances, the *Final Award* should therefore be vacated as a manifest disregard for the law. *Stolt-Nielsen*, 548 F.3d at 95 (under the manifest disregard standard, the court has the "responsibility to vacate arbitration awards in the rare instances in which the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it").

> *By excusing the existence of "just cause" for non-payment because of a subsequent payment plan, the Arbitrator acted in manifest disregard for the law*

In his *Final Award*, the Arbitrator correctly found just cause based on First Choice's history of non-payment and late payment for product. *See* Ex. F at 4, 9 (finding that "[o]ver time, First Choice did not pay for Products that it purchased for Conmed" *and* that "Puerto Rico's Law 75 also provides that failure to pay for product received constitutes just cause for termination"). Yet, the Arbitrator excused these findings because Conmed subsequently imposed to a payment plan on First Choice to recover the monies that had been wrongfully unpaid. *See* Ex. F at 9 ("the Parties entered into the 2019 SAL which resolved previously unresolved issues and provided a payment plan to address the arrearages going forward")

By finding that the Conmed's implementation of a payment plan somehow negated prior "just cause" to terminate, the Arbitrator violated well-settled law applying Law 75. Indeed, the argument that agreement to a payment plan somehow excuses or negates the existence of "just cause" is an argument that has been specifically rejected by the courts in the past.

As an initial matter, "[c]ourts [interpreting Law 75] consistently have held that regularly paying for goods on time normally is one of the essential obligations of the dealer's contract, and that a dealer's failure to meet this obligation constitutes just cause for termination." *Greenville*

*Funeral Supply, LLC v. Rockvale, Inc.*, 597 F. Supp. 2d 241, 245 (D.P.R. 2008) (citing cases); *see also PPM Chem. Corp. of P.R. v. Saskatoon Chem. Ltd.*, 931 F.2d 138, 140 (1st Cir. 1991); *Tatan Mgmt. v. Jacfran Corp*., 270 F. Supp. 2d 197, 201-202 (D.P.R. 2003); *Freightliner, L.L.C. v. Puerto Rico Truck Sales, Inc.*, 399 F. Supp. 2d 57, 61 (D.P.R. 2005). The factual record at the Arbitration unequivocally demonstrated that timely payment was an essential term of the parties' agreement and that First Choice was perennially and consistently late in its payments, and not in a minor way. Rather, First Choice's unpaid invoices *spanned years* and included not a handful, but *hundreds*, of individual invoices. *See* Arb. Exs. 8-10.

As a threshold matter, a party damaged by another's breach of contract has the affirmative obligation to mitigate its damages—that is, it "must take the necessary steps to reduce or contain the damages suffered ... unless the situation is one in which no such amelioration is possible." *Computec Sys. Corp. v. Gen. Automation, Inc.*, 599 F. Supp. 819, 828 (D.P.R. 1984). Thus, once First Choice breached its contractual obligations by failing to pay for the Conmed product shipped to it between 2015 and 2018, Conmed was *obligated* to accept partial payments, if they were offered, to reduce the damages it suffered from First Choice's breach. The fact that it did accept partial payments did not excuse, release, or extinguish First Choice's original breach. *See* N at ¶¶ 31-45; Tr. [Ex. P] at 452, lns. 22-25; Tr. at 453, ln. 1.

Conmed's attempt at mitigation does not prevent it from pursuing its legal remedies for the various breaches. Yet, the Arbitrator found that Conmed's acceptance of a payment plan, or thereafter accepting partial payments instead of full payments, somehow negated or excused First Choice's underlying breach of non-payment or late payment. Of course, the two issues are unrelated. Conmed's efforts to mitigate its damages are distinct from First Choice's prior untimely payment and/or non-payment and does not release or extinguish the underlying breach.

The issue of payment plans has come up several times in Law 75 cases where comparable arguments have been made—and have been uniformly rejected. That is, by working out a payment plan, a supplier does *not* somehow waive its right to terminate or weaken its claim of just cause. *See, e.g.*, *Tatan Mgmt.* 270 F. Supp.2d at 201-02 ("[t]hat [the supplier] tolerated due balances and attempted to resolve the dispute amicably through reasonable payment plans does not mean that they altered the terms and somehow excused [the dealer's] timely performance").

The First Circuit in *Waterproofing Sys., Inc. v. Hydro-Stop, Inc.,* explained why such arguments are inherently hostile to the policy underlying Law 75. There, a distributor was often late in its payments to the supplier. 440 F.3d 24, 29 (1st Cir. 2006). In evaluating whether those overdue payments presented just cause for termination, the magistrate considered that the supplier had extended credit and agreed to payment plans and thus "concluded that because the [supplier] had not previously terminated the Distribution Agreement because of late payment, it could not suddenly change course without violating the principle enshrined in Law 75." *Id.* Thus, the magistrate's ruling was essentially the same as the Arbitrator's here.

On appeal, the First Circuit disavowed this conclusion, as "troubling," finding:

> It may well be that [the supplier] was willing to overlook the untimely payments because of [the dealer's] successful sales records for the first four years of their relationship. **However, we think it quite possible that there was a limit to the supplier's patience** ... The magistrate would have us hold that while [the dealer's] indebtedness in March 2004 might have constituted just cause if it had been the first such occurrence, it could not legitimately have been the proverbial straw to break the camel's back. We disagree. **It is contrary to** the **principle enshrined in Law 75 to require that suppliers terminate distribution agreements immediately upon distributors' failure to pay timely**, **or risk being forever banned from so doing**. Such a result would discourage efforts on the part of suppliers to reach creative solutions to enable the success of long-term relationships with distributors in Puerto Rico. *Id.* at 29-30.

Other Law 75 cases have similarly held that agreeing to payment plans upon non-payment or late payment *does not negate* the original just cause created by the failure to pay.

In *Casco Sales Co. Inc*., the District of Puerto Rico rejected the argument that a supplier's acquiescence to late payments somehow changed the requirements of the contract or foreclosed a finding of just cause. *Casco Sales Co. v. Maruyama U.S., Inc*., 901 F. Supp. 2d 311, 320-322 (D.P.R. 2012). In a holding that is particularly applicable to this matter, the Court found:

> *it makes no sense* to allow [the dealer], who requested (and received) [the distributor]'s's assistance in reducing its persistent cash flow constraints, to conveniently use the Maruyama's well-intentioned cooperation against it. **Such an outcome would turn Law 75 on its head, forever chaining a supplier—that attempts to resolve a dispute amicably <u>through reasonable payment plans</u>— from terminating an unworkable relationship with its dealer**.

*Id.* at 321 (emphasis added)*; Cf. Dyno Nobel, Inc. v. Amotech Corp*., 63 F.Supp.2d 140, 150-51 (D.P.R.1999) (finding just cause to terminate when despite repeated efforts by the distributor "to set reasonable payment schedules," the dealer "continued its untimely payments").

Here, under a similar factual pattern, Conmed continually attempted to work with First Choice to resolve its non-payment issues. It implemented a payment plan that was also broken. Conmed cannot be faulted for its patience. Similar to the holding in *Tatan*, "[f]aced with a pattern of broken promises and breached agreements, [Conmed] cannot be blamed for exercising [its] rights under the contract and under Puerto Rico law to end a dealers' relationship that became unworkable." *Tatan Mgmt*. 270 F. Supp. 2d at 204.

Thus, the Arbitrator's ruling is contrary to a well-settled body of law holding that payment plan agreements, which follow non-payment for shipped product, do not negate the existence of just cause or prevent a supplier from terminating. Like in *New York Telephone Co.,* the Arbitrator's disregard for this controlling line of precedent constitutes "manifest disregard" and justifies the vacatur of the Final Award. 256 F.3d at 93 (arbitrator was in "manifest disregard of the law" by applying the ignoring controlling precedent to reach his determination dispute).

The elements of manifest disregard on this have thus been demonstrated: (1) the law the

Arbitrator ignored was clear; (2) the improperly applied law led to an erroneous outcome; and (3) the Arbitrator was placed on express notice of the issue and the governing law prior to his Final Award. *See* Ex. Q at pp. 29–32 (setting forth the legal authority regarding the effect of payment plans on a finding of just cause). Accordingly, the Court should properly vacate the Final Award should as a manifest disregard for the law for this reason as well.

<u>*The breach of the payment plan was a separate actionable instance of just cause*</u>

Finally, the Arbitrator also ignored the legal effect of the undisputed breach by First Choice of the payment plan that was put in place in the 2019 SAL. He found that such a breach—*i.e.*, non-compliance with the payment plan—occurred but nonetheless concluded that the shortfall was *not enough* to warrant termination. *See* Ex. F.

But the consequences for not meeting the letter of the payment plan in the 2019 SAL was clearly stated in that agreement. Failure of that obligation was described there as grounds for *immediate termination*. *See* Ex. B at 2 ("CONMED may immediately terminate this SAL in the event the Company: (i) fails to … make the $6,000 monthly payments")[7]. And, failure to comply with a payment plan *itself* constitutes separate and independent just cause to terminate the distributorship under Law 75. *See Greenville Funeral Supply*, 597 F. Supp. at 247 (dealer's failure to comply with a payment plan was a breach of an "essential obligation" and provided just cause for termination). Thus, the Arbitrator's findings that no just cause existed, even accepting his own findings of fact, are in manifest disregard of the law for this reason as well.

## CONCLUSION

For all the foregoing reasons, Conmed respectfully requests that the Court grant the

---

[7] It is undisputed that within a month—*i.e.*, by January 15, 2019—First Choice had already violated this agreed payment plan. *See* Arb. Ex. 12. First Choice would violate the payment plan on at least three additional occasions in March, July, and August of 2020. See Ex. N. at ¶ 38.

Petition and enter: (1) an Order vacating the Arbitrator's *Choice-of-Law Decision* on the grounds that it exceeded the Arbitrator's powers under the Arbitration Clause because that clause required that New York law, not Puerto Rican law, be applied to the Arbitration; and/or (2) an Order vacating the Arbitrator's *Final Award* as being in manifest disregard of clear and applicable legal authority governing the parties' dispute; and such further relief as the Court deems proper.

Dated: November 18, 2021          Respectfully submitted,
      Syracuse, New York

By: _____

HANCOCK ESTABROOK LLP
John G. Powers, Esq. (508934)
Mary L. D'Agostino, Esq. (520301)
1800 AXA Tower I
100 Madison St.
Syracuse, NY 13202
(315) 565-4500

COUNSEL FOR PETITIONER
CONMED CORPORATION