UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CONMED CORPORATION,

Petitioner,

vs.

FIRST CHOICE PROSTHETIC & ORTHOPEDIC
SERVICE, INC.,

Respondent.

6:21-CV-01245
(BKS)

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF CONMED'S
PETITION AND IN OPPOSITION TO FIRST CHOICE'S CROSS-PETITION**

HANCOCK ESTABROOK LLP
John G. Powers, Esq. (508934)
Mary L. D'Agostino, Esq. (520301)
1800 AXA Tower I
100 Madison St.
Syracuse, NY 13202
(315) 565-4500

COUNSEL FOR PETITIONER CONMED CORPORATION

{H4839688.5}

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 1

   I.   THE ARBITRATOR'S CHOICE-OF-LAW DECISION MUST BE VACATED ............. 1

     A.   Petitioner need not meet the manifest disregard standard on the choice of law issue .. 3

     B.   Respondent has completely ignored the dispositive choice-of-law question in its opposition ................................................................................................................... 4

     C.   Respondent's argument that a New York court would not enforce an New York choice-of-law provision is absurd. ....................................................................................... 6

   II.   THE ARBITRATOR MANIFESTLY DISREGARDED THE LAW BY IMPLIEDLY FINDING THAT CONMED HAD RELEASED FIRST CHOICE .......................................... 7

   III.  THE ARBITRATOR MANIFESTLY DISREGARDED THE LAW BY FINDING THAT CONMED'S IMPLEMENTATION OF A PAYMENT PLAN FOR FIRST CHOICE "WAIVED" JUST CAUSE .................................................................................................. 11

   IV.  FIRST CHOICE'S PROCEDURAL ARGUMENTS ARE WITHOUT MERIT AND MUST BE REJECTED. ........................................................................................................ 15

     A.   "Petitions to vacate" are routinely considered by the Second Circuit and United States Supreme Court. .......................................................................................................... 15

     B.   The Court was provided with a sufficiently complete record upon which to decide the merits of the Verified Petition ................................................................................... 19

   V.   THERE IS NO AUTHORITY FOR FEE SHIFTING FOr VACATUR/CONFIRMATION MOTIONS UNDER THE FAA ........................................................................................... 21

   VI.  First Choice's REMAINING ARGUMENTS ARE WITHOUT MERIT. ...................... 22

     A.   There is no merit to the claim that Conmed's Petition is "moot" by virtue of First Choice's payment of the outstanding debt .................................................................. 22

     B.   The equitable doctrines raised by First Choice are unavailing and do not apply ....... 24

CONCLUSION .................................................................................................................... 25

## PRELIMINARY STATEMENT

Petitioner's application to partially vacate Arbitrator David C. Singer's award has raised several discrete issues that do not challenge the Arbitrator's factual findings but rather are largely based either on either well-settled law or the plain meaning of the parties' written agreements. In response, Respondent has relied largely on procedural arguments, and mounted very little substantive challenge to the grounds set forth in the Petition. Respondent therefore presents no colorable impediment to the Court granting the Petitioner's request for partial *vacatur*.

To this end, the Petition does not challenge the Arbitrator's factual findings, but rather challenges: (1) his decision to ignore the parties' contractual agreement that the arbitration itself should be conducted according to New York law; and (2) his decision that any "just cause" present as a result of the Respondent's undisputed failure to pay for product over the course of four years was somehow excused or released by the terms of the 2019 agreement between the parties (the "2019 SAL"). Correction of either of these errors by the Arbitrator would necessarily result in the different outcome for the arbitration and would allow Petitioner to terminate the Respondent without penalty. Accordingly, these errors, which justify the partial *vacatur* of the final arbitration award under 9 U.S.C. § 10(a)(4) and/or the "manifest disregard" standard, are ripe for review by the Court.

For the reasons set forth more fully below, the Court should partially vacate the final arbitration award in the manner specifically requested in the Petition and deny Respondent's cross-petition to confirm the final arbitration award.

## ARGUMENT

## I.   THE ARBITRATOR'S CHOICE-OF-LAW DECISION MUST BE VACATED

Conmed's Verified Petition, and supporting papers, set forth the reasons and supporting Supreme Court case law establishing why and how the FAA preempts state statutory schemes

that would purport to invalidate arbitration agreements that specify the "ground rules" for how an arbitration is to be conducted. *See generally* Dkt. No. 1. Among the different types of contractual ground rules that the Supreme Court has held courts must enforce, are arbitration provisions that specify that a particular body of law must be applied during the arbitration. *See, e.g.*, *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (the FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms" which would include enforcing an agreement where "the parties have agreed to arbitrate in accordance with California law."); *c.f. Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991) (vacating the arbitrator's award under to 9 U.S.C. § 10(a)(4) for exceeding his powers where he ignored a New York choice-of-law provision and entered relief prohibited by that state's substantive law).

For example, in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* the Supreme Court held that FAA preempted Puerto Rican law to the extent the latter invalidated a part of the parties' arbitration clause. 473 U.S. 614, 631 (1985). Though *Mitsubishi* concerned a choice-of-forum clause, not choice-of-law clause, the Court analogously held that a "contractual [arbitration] provision specifying in advance the forum in which disputes shall be litigated *and the law to be applied* is an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." *Id.* (internal quotation omitted) (emphasis added). The Supreme Court noted with approval that the First Circuit had found that the FAA pre-empted any policy-based nullification of the parties' contractual choice of forum required by Law 75. *See id.* at 621, n.8.

Here, the parties' arbitration agreement did not just have an arbitration provision and a separate choice-of-law provision that were even arguably unrelated to each other. Rather, the

parties' agreement expressly stated that *the arbitration itself* would be conducted according to New York law. *See* Dkt. No. 1-2 [Ex.] at 2-3 ("*any arbitration hereunder shall apply the laws of the State of New York*"). Thus, the legal issue before Arbitrator Singer was *not* whether he should enforce a garden variety choice-of-law provision in a contract. Rather, the issue was whether the individual Puerto Rican statutory provision invalidating choice-of-law provisions could override the FAA's pre-emptive enforcement of the parties' express contractual agreement that the arbitration *itself* should be conducted under New York law. The Arbitrator was clearly apprised that this was the dispositive issue to be determined *and* was provided with the controlling law that applied to that dispositive question. *See* Dkt. No. 1-7 [Ex. G] at Point I, Dkt. No. 1-8 [Ex. I] at pp. 6-20. Similarly, Petitioner has presented the Court with this specific legal issue and the controlling law *via* the Petition and supporting Memorandum of Law. *See* Dkt. No 1-25 [MOL] at pp. 10-15.

Arbitrator Singer failed to address this important legal question and completely ignored the controlling law on this issue in his decision. Instead, he conducted an ordinary choice-of-law analysis as if a generic contractual choice-of-law provision was at issue. *See* Dkt. No. 1-5 [Ex. E] at pp. 2-3. It was not. This error is clear from the four corners of his choice-of law decision and requires the *vacatur* of his decision. *See generally* Dkt. No. 1-5 [Ex. E].

**A.    *Petitioner need not meet the manifest disregard standard on the choice-of-law issue.***

Respondent's opposition implies that this choice-of-law error by the Arbitrator is to be reviewed under the permissive "manifest disregard of the law" standard. Not so. *Compare* Dkt. No. 47 at Point II(D), *with* Dkt. No. 1-25 [MOL] at Point I. Among the enumerated grounds for *vacatur* of an arbitration award, is where the arbitrator "exceeded [his] powers." 9 U.S.C. § 10. Under this provision, a Petitioner can meet its burden by showing that the arbitrator disregarded

some portion of the parties' agreement as to the scope or ground rules of the arbitration. *See, e.g.,*

*Barbier*, 948 F.2d 117 (the Second Circuit held that there is "no clearer example" of an arbitrator

exceeding his power under 9 U.S.C. § 10(a)(4) than one who disregards a choice-of-law

provision that controls the conduct of an arbitration). Here, the arbitrator unquestionably did so,

which completely changed the legal standards governing the parties' dispute.

To be clear, the Arbitrator's decision in this regard was *also* a manifest disregard of the

law (and Conmed has so argued). *See* Dkt. No. 1-25 [MOL] at pp. 18-20. But the point is that

Conmed need not meet the "manifest disregard" standard as to this issue because it falls within

the scope of 9 U.S.C. § 10(a)(4).[1] *See id.* at Point I (arguing that he choice-of-law decision

should be vacated under 9 U.S.C. § 10(a)(4)).

> **B.      Respondent has completely ignored the dispositive choice-of-law question in its opposition.**

As stated above, when the issue is appropriately framed, the legal question before the

Arbitrator, and now this Court, was whether FAA pre-emption rules *requiring* enforcement of

the parties' agreement to arbitrate overrides conflicting public policy considerations in Puerto

Rican Law 75, which would otherwise invalidate the parties' agreement to arbitrate according to

New York law. This question is answered conclusively in *AT&T Mobility LLC v. Concepcion*,

563 U.S. 333, 339 (2011), which confirms that protective state statutory schemes, like Law 75,

necessarily give way to the FAA pre-emptive effect. *See* Dkt. No. 1-25 [MOL] at pp. 14-16.

Respondent's brief effectively commits the same error as the Arbitrator by ignoring the

---

[1] Though First Choice describes "whether the arbitrator's award draws its essence from the agreement to arbitrate" as the **sole** inquiry, the Second Circuit has never described the standard under 9 U.S.C. § 10(a)(4) that narrowly. The "*appropriate inquiry*" is rather "whether, based on the parties' submissions or the arbitration agreement, the arbitrator had the authority to reach an issue." *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 115 (2d Cir. 2011). Thus, while *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81 (2d Cir. 2009) correctly described that inquiry as narrow—indeed, an arbitrator either does or does not have the authority to reach an issue— it is not an insurmountable burden. In fact, despite its narrowness, the Second Circuit described "no clearer example" than the disregard of a choice-of-law provision. *See Barbier*, 948 F.2d at 122.

*actual* issue raised and citing to a handful of general Puerto Rican district court cases that apply Law 75 to invalidate ordinary contractual choice-of-law provisions. *See* Dkt. No 47 at Point I(A)(1); *see also id.* at pp. 15-16. None of these cases address the *Volt/Concepcion* issue, where protective state statutory scheme conflicts with the FAA pre-emptive policy requiring enforcement of arbitration ground rules.

Later in Respondent's brief, *see* pp. 36-37, it at least *attempts* to distinguish *Volt* and *Concepcion* on their facts, albeit incorrectly. But nowhere in its 43-page brief, does First Choice *ever* address the main issue raised by Petitioner—*i.e.*, whether a protective Puerto Rican statutory provision nullifying contractual choice-of law-provisions can override the FAA pre-emptive enforcement of arbitration provisions requiring the application of a particular substantive law in the arbitration. First Choice *never* address this issue, let alone cites any countervailing legal authority.

Even Respondent's attempts to distinguish *Volt* and *Concepcion* describe the holdings of the case in a generic way that fails to address their import to this case. For example, Respondent argues that nothing in *Volt* would indicate that an arbitrator "lacked the power to interpret a choice-of-law clause under federal and state law." Dkt No. 47 at p. 37. But the Supreme Court in *Volt* literally held that enforcing parties' agreement as to the law to be applied in arbitration itself is "fully consistent with the goals of the FAA." *Volt*, 489 U.S. at 479 ("[j]ust as they may limit by contract the issues which they will arbitrate,…so too may they specify by contract *the rules under which that arbitration will be conducted*" (emphasis added)).

Similarly, Respondent argues that the holding of *Concepcion* is "irrelevant" to this case because Law 75 "does not cause any structural interference on arbitration like the one caused by the California rule in *Concepcion*." Dkt No,. 47 at 37. Yet, First Choice's argued application of

Law 75 would *directly interfere* with the parties' express contractual agreement to conduct this arbitration under a certain rule of substantive law.  The type of law applied is inarguably a structural limitation on the arbitration. Thus, the argued application of the Law 75 is directly thwarting *the manner in which* the parties agreed to arbitrate—the *exact* situation present in *Concepcion*.[2]

Respondent's brief offers *zero* discussion, countervailing case law, or argument on this central, dispositive issue. *See generally* Dkt. No. 47. While First Choice is correct that an arbitrator enjoys generally unfettered discretion to decide the choice-of-law question, that is *only* true in a vacuum. Where an arbitrator disregards the parties' *express* contractual choice of law for the arbitration itself, that presents clear ground for *vacatur*. *See, e.g., Barbier*, 948 F.2d 117 (the Second Circuit held that there is "no clearer example" of an arbitrator exceeding his power under 9 U.S.C. § 10(a)(4) than one who disregards a choice-of-law provision that controls the conduct of an arbitration).

### C.   Respondent's argument that a New York court would **not** *enforce an New York choice-of-law provision is absurd.*

As an apparent fallback argument, Respondent argues that even under New York law, the arbitration provision requiring the arbitrator to apply New York law would not be enforceable. Dkt. No. 47 at pp. 16-19. Respondent cites to no applicable case for this proposition. In fact, Respondent relies primarily on the New York Court of Appeals decision in *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364 (2015) for the proposition that a New York court will not always enforce a contractual choice-of-law provision. Dkt. No. 47 at p. 17.

---

[2] Though First Choice asserts that *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564 (2013) is "analogous," it is difficult to see how that it so. *Oxford* did not consider the parties' agreement to arbitrate according to a certain body of substantive law. Rather, it considered the narrow question of whether § 10(a)(4) of the FAA allows a court to vacate an arbitral award when the parties agreed that the arbitrator should decide whether their contract authorized class arbitration and the arbitrator determined the very question that the parties submitted from him to decide.

What Respondent neglects to mention is that in *Brown & Brown*, the Court of Appeals stated that courts *must* enforce contractual choice-of-law agreements unless that contractual provision requires application of a "*foreign laws* that are truly obnoxious." *Id*. at 368. In order to invoke this exception, the party challenging the contractual provision bears the "heavy burden" of proving that *the foreign law* "would be offensive to a fundamental public policy of *this State*." *Id*. *New York law* is, of course, neither foreign, obnoxious, nor offensive *to New York courts*. Neither *Brown & Brown*—nor any other case cited by Respondent—supports the remarkable assertion that a New York court would refuse to enforce a contractual choice-of-law provision requiring the application of New York law.

## II.   THE ARBITRATOR MANIFESTLY DISREGARDED THE LAW BY IMPLIEDLY FINDING THAT CONMED HAD RELEASED FIRST CHOICE

One of the discrete arguments presented in Conmed's Petition is that the Arbitrator's decision on the merits manifestly disregarded the law when he found that First Choice's failure to pay for product *was* "just cause" under Law 75 *but* that Conmed had *released* that culpability by entering into the 2019 SAL. *See* Dkt. No. 1-25 [MOL] at pp. 18-21. Nowhere in the 2019 SAL is there any clear, conclusive, and unmistakable language indicating that Conmed was releasing First Choice from the potential consequences of its pre-existing contractual breaches. *See generally* Dkt. No. 1-2 [Ex. B]. The Arbitrator's decision otherwise was merely the fashioning of his own "brand of industrial justice."[3] In other words, the Arbitrator could not avoid the clear case law establishing that First Choice's undisputed years of failure to pay for product on time constituted "just cause" under numerous First Circuit cases. Instead, in order to essentially let First Choice off the hook for its own conduct, the Arbitrator found that the parties'

---

[3] "[A]n arbitrator is confined to interpretation and application" of the parties' contract and "does not sit to dispense his own brand of industrial justice."… "When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

agreement to continue their distribution relationship in 2019, constituted a waiver or release by Conmed of First Choice's prior contractual misconduct. *See* Dkt. No. 1-7 [Ex. F].

The message sent by the Arbitrator's decision to state-side suppliers is: don't continue any commercial relationship with a Puerto Rican distributor once a breach has occurred but rather terminate immediately less you be found to impliedly release that breach. *See* Dkt. No. 1-7 [Ex. F]. Obviously, that is not the policy behind Law 75, nor is it the law of Puerto Rico, or any other state for that matter. A "release" is a conscious and deliberate contractual act that requires clear and unequivocal language. Moreover, the case law interpreting Law 75 has *repeatedly* counseled courts to *not* penalize suppliers for attempting to work with or implement payment plans by interpreting those efforts as a waiver of the presence of just cause.[4] Thus, all at once, the Arbitrator violated basic precepts of contractual law and the public policy behind Law 75 by "looking the other way" to excuse First Choice's years of non-payment for product. *See* Dkt. No. 1-7 [Ex. F].

### A. *First Choice's Argument that the 2019 SAL constituted a release is contrary to Puerto Rican contract law*

In response, First Choice argues that the 2019 SAL was both a settlement agreement and a release, relying on the First Circuit's decision in *Ruiz-Sanchez v. Goodyear Tire & Rubber Co.*, 717 F.3d 249, 252 (1st Cir. 2013). First Choice vaguely argues that the Arbitrator "received sufficient evidence showing that the negotiation and execution of the 2019 SAL" was intended as

---

[4] *See, e.g.*, *Waterproofing Sys., Inc. v. Hydro-Stop, Inc.*, 440 F.3d 24, 29 (1st Cir. 2006) ("[i]t is contrary to the principle enshrined in Law 75 to require that suppliers terminate distribution agreements immediately upon distributors' failure to pay timely, or risk being forever banned from so doing"); *Casco Sales Co. v. Maruyama U.S., Inc.*, 901 F. Supp. 2d 311, 320-322 (D.P.R. 2012) ("it makes no sense to allow [the dealer], who requested (and received) [the supplier's] assistance in reducing its persistent cash flow constraints, to conveniently use the [the supplier's] well-intentioned cooperation against it"); *Tatan Mgmt. v. Jacfran Corp.*, 270 F. Supp. 2d 197, 201-202 (D.P.R. 2003) ("[t]hat [the supplier] tolerated due balances and attempted to resolve the dispute amicably through reasonable payment plans does not mean that they altered the terms and somehow excused [the dealer's] timely performance"); *c.f. Dyno Nobel, Inc. v. Amotech Corp.*, 63 F.Supp.2d 140, 150-51 (D.P.R. 1999) (finding just cause to terminate when despite repeated efforts by the distributor "to set reasonable payment schedules," the dealer "continued its untimely payments").

a release and resolve all disputes then between the parties. Dkt No. 47 at p. 25. But First Choice *never* identifies the language within the four corners of the 2019 SAL that constituted a release or settlement. *See* Dkt. No. 1-2.

*Ruiz-Sanchez* certainly does not support the proposition that an ordinary commercial agreement—like the 2019 SAL—can be *impliedly* interpreted as a release. In fact, the contract provision at issue in *Ruiz-Sanchez* was actually titled *"general release"* and was phrased as a prototypical release, releasing "all known and unknown claims, promises, causes of action, or similar rights of any type that [the employee] presently may have...with respect to [Goodyear]." *Ruiz-Sanchez*, 717 F.3d at 251. Not only is there no general release in the 2019 SAL, but there is also no language in the agreement that even remotely or indirectly addresses prior claims or liability.[5] *See* Dkt. No. 1-2.

Under either Puerto Rican or New York law, a release may not be *implied* to exist in a contract where it is not clearly and unequivocally stated. In *Cabrera v. Doval*, the Puerto Rican Supreme Court held that a release must be stated in "clear, conclusive, and unequivocal" terms and may "not be generally presumed." *Cabrera v. Doval*, 76 P.R.R. 728, 731 (1954) ("[c]lear and explicit language is required in the contract to absolve a person from the consequences of his own neglect"). The District Court of Puerto Rico applied this rule in *Travelers Indem. Co. v. S. Klein of Puerto Rico, Inc.*, 676 F. Supp. 32, 37 (D.P.R. 1987). There, the defendant alleged that certain documents sent by the plaintiff released defendant from the liability for its conduct. *Id.* at

---

[5] The New York cases cited by First Choice do not support its argument either. *See* Dkt. No. 47 at Point I(B). In *Tortomas v. Pall Corp.*, the agreement being enforced contained an unequivocal release, which "unconditionally and irrevocably release[d], waive[d], discharge[d], and g[a]ve[] up, to the full extent permitted by law, any and all Claims … that [Plaintiff] may have against [Defendant] …." No. 18CV509, 2020 WL 2933669, at *1 (E.D.N.Y. May 31, 2020). In *Rates Tech. Inc. v. Speakeasy, Inc.*, the agreement being enforced contained a provision whereby the plaintiff "release[d] and promise[d] not to sue [the defendant] for any past or future infringement of the Patents. "685 F.3d 163, 165 (2d Cir. 2012). In *Capri Sun GmbH v. Am. Beverage Corp.*, the plaintiff "covenant[ed] and agree[ed] not to either directly or indirectly (a) challenge or contest, or assist in the challenging or contesting, of the validity, enforceability or ownership of the…Trademark."414 F. Supp. 3d 414, 421–22 (S.D.N.Y. 2019). No such clear or unequivocal release language is present here in the 2019 SAL. *See* Dkt. No. 1-2.

37. Applying *Cabrera,* the district court rejected the defense because the documents did not contain "a *clear, conclusive and unequivocal renunciation of a right*, as required by the laws of the Commonwealth of Puerto Rico." *Id.* (emphasis added). In fact, Puerto Rican law requires that the "the language used in the discharge document" to state the terms of the release "clearly and explicitly…either expressly referring to the [specific liable act] or stating such intention in no uncertain terms." *Chico v. Ed. Ponce, Inc.*, 101 P.R. Dec. 759, 778-79 (1973).[6]

The Arbitrator did not violate these principles by mistake. He was clearly alerted to *this specific issue* and the relevant legal standards by Conmed prior to issuing his final decision. *See* Dkt. No. 1-22 [Ex. S] at pp. 3–4 (citing *Cabrera v. Doval* and *Chico v. Ed. Ponce, Inc.*, and arguing "First Choice cannot point to any writing where Conmed purports to waive or release First Choice from its liability for hundreds of prior breaches of the parties' agreement between 2014–2018."). Ordinary mistakes in contract interpretation do not typically satisfy the manifest disregard standard. But where an arbitrator's interpretation of a contract is egregiously wrong, amounts to paying mere lip service to contract interpretation, and actually effects a change in the contract, the manifest disregard standard is implicated. *See Giller v. Oracle USA, Inc.*, 512 F. App'x 71, 74 (2d Cir. 2013). Stated differently, the District Court of Puerto Rico described the manifest disregard standard as including an arbitrator's decisions that "is contrary to the plain language of the contract." *Johnson & Johnson Int'l v. Puerto Rico Hosp. Supply, Inc.*, 405 F. Supp. 3d 333, 345 (D.P.R. 2019); *see Cytyc Corp. v. DEKA Prods., Ltd. P'ship*, 439 F.3d 27, 33 (1st Cir. 2006) (noting that the manifest disregard of the law doctrine "arises in those rare cases in which it is clear from the record that arbitrators cavalierly disregarded applicable law").

---

[6] Under New York law, in order to be a release, a contract must "clearly and unambiguously" release prior liability, identifying the scope and breadth of what is being released and it must do so "with specificity." *Moore v. Cohen*, 19-CV-4977, 2021 WL 2986398, at *8 (S.D.N.Y. July 13, 2021). An integration clause is not a release. *DeBenedictis v. Malta*, 140 A.D.3d 438, 438-39 (1st Dep't 2016) (defendant "failed to establish any waiver, release, or limitation of his fiduciary obligations, simply by virtue of a standard integration clause in the parties' agreement").

This standard is met here. The Arbitrator's interpretation of the 2019 SAL cannot be reconciled with any Puerto Rican nor New York authority or even a colorable reliance on the terms of the agreement itself. There is simply no release in the 2019 SAL or language that could arguably be considered a release. By finding that the 2019 SAL released the Respondent, the Arbitrator manifestly disregarded the parties' agreement and thus disregarded the law.

### III.   THE ARBITRATOR MANIFESTLY DISREGARDED THE LAW BY FINDING THAT CONMED'S IMPLEMENTATION OF A PAYMENT PLAN FOR FIRST CHOICE "WAIVED" JUST CAUSE

Similar to the release issue, the Arbitrator attempted to fashion his own brand of industrial justice by excusing the "just cause" established by four years of ubiquitous late and non-payment by First Choice based Conmed's agreement to accept monthly payments from First Choice to pay down the six-figure arrearage. *See* Dkt. No. 1-6 [Ex. F]. Indeed, the Arbitrator *did* find that First Choice's repeated failure to pay for ordered product on time constituted "just cause" for termination under Law 75. *See id.* at pp. 4, 9 (finding that "[o]ver time, First Choice did not pay for Products that it purchased for Conmed" and that "Puerto Rico's Law 75 also provides that failure to pay for product received constitutes just cause for termination"). However, the Arbitrator inexplicably excused this "just cause" based on Conmed's willingness to agree to a payment plans with First Choice. *See* Dkt. No. 1-6 [Ex. F] at p. 9 ("the Parties entered into the 2019 SAL which resolved previously unresolved issues and provided a payment plan to address the arrearages going forward").

In its moving papers, Conmed provided the Arbitrator with clear First Circuit authority establishing that a supplier's agreement to payment plans in an effort to mitigate the damage caused by the distributor's breach of its payment obligations does *not* waive the right to terminate under Law 75. *See Waterproofing Sys., Inc. v. Hydro-Stop, Inc.*, 440 F.3d 24, 29 (1st Cir. 2006) ("[i]t is contrary to the principle enshrined in Law 75 to require that suppliers

terminate distribution agreements immediately upon distributors' failure to pay timely, or risk being forever banned from so doing"); *Casco Sales Co. v. Maruyama U.S., Inc.*, 901 F. Supp. 2d 311, 320-322 (D.P.R. 2012) ("it makes no sense to allow [the dealer], who requested (and received) [the supplier's] assistance in reducing its persistent cash flow constraints, to conveniently use the [the supplier's] well-intentioned cooperation against it"); *Tatan Mgmt. v. Jacfran Corp.,* 270 F. Supp. 2d 197, 201-202 (D.P.R. 2003) ("[t]hat [the supplier] tolerated due balances and attempted to resolve the dispute amicably through reasonable payment plans does not mean that they altered the terms and somehow excused [the dealer's] timely performance"); *c.f. Dyno Nobel, Inc. v. Amotech Corp.*, 63 F.Supp.2d 140, 150-51 (D.P.R. 1999) (finding just cause to terminate when despite repeated efforts by the distributor "to set reasonable payment schedules," the dealer "continued its untimely payments").

The Arbitrator was provided this law prior to issuing his decision, *see* Dkt. No. 1-20 [Ex. at pp. 29–32 (setting forth the legal authority regarding the effect of payment plans on a finding of just cause). Yet, he still manifestly disregarded this law.

Respondent argues that the Petitioner has overlooked an exception set forth in the case law that is "popularly called" the so-called "flexible repayment exception." Dkt. No. 47 at p. 24. As Respondent describes this exception, it appears to hold *exactly the opposite* of the First Circuit's decision in *Waterproofing Sys.*—that is First Choice posits that a supplier's efforts to mitigate the damage caused by a distributor's repeated non-payment for product *excuses* a distributor's strict compliance with payment terms. *See id.*

A search of *Westlaw* for First Circuit cases mentioning the so-called "popularly" used phrase "flexible repayment exception" yields zero cases. Respondent's citation to *Biomedical Instrument & Equip. Corp. v. Cordis Corp.*, 797 F.2d 16 (1st Cir. 1986) does not establish such

an exception either. Rather, in *Biomedical*, the First Circuit agreed that "consistent failure to pay on time" likely constitutes just cause absent "special circumstances." *Id.* at 17. And the First Circuit further limited this exception in *PPM Chemical Corp. v. Saskatoon Chemical, Ltd.,* 931 F.2d 138 (1st Cir. 1991), by holding that it applied only in the "[u]nusual, abnormal circumstance in which a supplier does not care about late payments." *Id.* at 140.

Ensuing case law has defined and narrowed the "unusual, abnormal circumstances exception". This limitation is utterly inconsistent with Respondent's view of the law and certainly has not given rise to a so-called "flexible repayment exception." *See, e.g.*, *Casco Sales Co.*, 901 F. Supp. 2d at 318 (*rejecting* the argument that a supplier waives just cause "by continuously accepting late payments, and continuing to sell to [the distributor]"). The district court in *Casco*, citing other authority, held that the "unusual, abnormal circumstances exception" does *not* apply where the parties' written agreement expressly specifies that timely payment is an essential obligation under the agreement. *See id.*; *see also Greenville Funeral Supply, LLC v. Rockvale, Inc.,* 597 F.Supp.2d 241, 245 (D.P.R.2008) (finding that terms "expressly set out" in written agreement "quite clearly were essential obligations of the dealer's contract between the parties"). Here, it was undisputed that both the parties' agreement expressly stated that "the terms of [the] SAL…are Essential Obligations of [First Choice] under this Agreement." Dkt. No. 1-2 [Ex. B] at p. 2. The SAL also expressly stated that all sales were subject to "Conmed's invoice terms" which were "incorporated herein by reference." *See id*. at p. 3. The SAL also provided that Conmed may "immediately terminate" the SAL if First Choice "breaches a term of [the] SAL." *Id*. Thus, under the *Casco* and *Greenville*, the "unusual, abnormal circumstances exception" does not apply here.

*Casco* also noted that where the supplier regularly complains about a distributor's late

payment, the "unusual, abnormal circumstances exception" cannot apply either. *See Casco Sales Co.*, 901 F. Supp. 2d at 318. Conmed submitted undisputed evidence in the arbitration record that it sent monthly statements to First Choice itemizing all of the overdue invoices and identifying the aggregate amounts owed. *See* Dkt. Nos. 1-14 to 1-17 [Ex. N] at Teodorescu Aff., ¶ 17-19, Exs. 7-8. In addition, First Choice put in the arbitration record undisputed evidence that it regularly complained to First Choice regarding the overdue payments and arrearage. Dkt. Nos. 1-14 to 1-17 [Ex. N] at Teodorescu Aff., ¶ 83-95, Exs. 24-25. This too forecloses any reliance on the "unusual, abnormal circumstances exception" in *Biomedical*. *Casco Sales Co.*, 901 F. Supp. 2d at 318-19.

Finally, the district court in *Casco* noted that the First Circuit had not applied the exception set forth in *Biomedical* for 26 years following that decision. The *Casco* court instead correctly noted the *Waterproofing Sys*, "rolled back" *Biomedical* by rejecting a trial court's reliance on an argument similar to argument made by First Choice here—that a supplier's agreement to a payment plan excused its non-compliance with its payment obligations. As described in *Casco*, the First Circuit "disavowed the magistrate judge's apparent reliance on *Biomedical*" finding that the institution of payment plans was the opposite of "not caring about" prompt payment, because it demonstrated an active attempt the reduce the supplier's debt. *Casco,* 901 F.Supp.2d at 319. The District of Puerto Rico also rejected First Choice's argument in *Freightliner, L.L.C. v. Puerto Rico Truck Sales, Inc.*, 399 F. Supp. 2d 57, 74-75 (D.P.R. 2005). There, the district court, distinguished Biomedical and found that "[e]ven if a principal has tolerated an overdue balance or sought to resolve disputes amicably through payment plans, the dealer is *not* excused from timely performance of its obligations to pay" under Law 75. *Id.* (emphasis added); *see also* id. n. 12.

In short, First Choice has cited no applicable authority that would support its position that a supplier who accepts late payments by a distributor, or otherwise implemented payment plans is somehow foreclosed from thereafter terminate that distributor for just cause. There is simply no such thing as the so-called "flexible repayment exception" as Respondent otherwise suggests.

### IV.   FIRST CHOICE'S PROCEDURAL ARGUMENTS ARE WITHOUT MERIT AND MUST BE REJECTED.

In an attempt to defeat the Petition, First Choice argues that the purported failure to title the Petition as a "Motion" is somehow fatal and any corrected document would be time barred. First Choice also argues that Conmed should have provided a full record—rather than a "sufficiently complete record." Both arguments should be rejected.

### A.   *"Petitions to vacate" are routinely considered by the Second Circuit and United States Supreme Court.*

First Choice does not dispute that it timely received the Verified Petition (and all supporting papers) within three months of the issuance of the Final Award. *See generally* Dkt. No. 47 at Point II(A)(1) and Point II(B)(1). Instead, First Choice argues that the combination of 9 U.S.C. § 12 and the N.D.N.Y. Local Rules *required* Conmed to file a "Notice of Motion," and the failure to do so was a "material defect" requiring dismissal. The argument is a pedantic and incorrect elevation of form over substance.

*First*, 9 U.S.C. § 12 sets forth *service requirements* for motions to vacate or confirm, it does not set forth requirements for *the form* of the papers filed. It does not, as respondent suggests, require that a "notice of motion" be served on respondent. Rather, it requires that "[n]otice *of a* motion to vacate, modify, or correct and award must be served upon the adverse party … within three months …." 9 U.S.C. § 12 (emphasis added). As is set forth in the record in this case, Conmed made numerous attempts to serve notice of its Petition to Vacate, over the course of several months because of Respondent's recalcitrant refusal to accept service of

process. *See* Dkt Nos. 8-11. Ultimately, service of process was sanctioned as timely by the Court. No such argument regarding untimeliness should be countenanced by the Court.

*Second*, to the extent that Respondent takes issue with use of the term "Petition" used to refer to Conmed's motion to vacate, such an objection should also be rejected by the Court. A request to a district court to vacate an arbitration award pursuant to 9 U.S.C. § 10 is to be made by "application" of any party. 9 U.S.C. § 10. Pursuant to 9 U.S.C. § 6, the application is to be made and heard by the Court "*in the manner* provided by law for making and hearing of motions …" 9 U.S.C. § 6. The policy behind 9 U.S.C. § 6 is merely to "expedite judicial treatment of matters pertaining to arbitration." *World Brilliance Corp. v. Bethlehem Steel Co.*, 342 F.2d 362, 366 (2d Cir. 1965). Thus, they are to be heard by the Court in the manner in which motions are heard—not as plenary actions which require extended discovery periods, motion practice, etc. *Id*.; *see also Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1714 (2022) (the "directive to a federal court to treat arbitration applications 'in the manner provided by law' for all other motions *is simply* a command to apply the usual federal procedural rules, including any rules relating to a motion's timeliness" (emphasis added)).

Such "applications," to be considered by the district court summarily "in the manner of motions" are routinely referred to as "petitions." In fact, the Supreme Court and Second Circuit has *no problem* considering or ruling on applications to vacate or confirm that are referred to as "petitions." *See, e.g., Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 669-70 (2010) (reversing appellate court and granting a "Petition to Vacate Arbitration Award"); *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 160 (2d Cir. 2021) (using 'petition to vacate' and 'motion to vacate' interchangeably, stating that the petitioner "had until December 9, 2019, to properly serve notice of any motion *or petition to vacate the award*"); *Seneca Nation of*

*Indians v. New York*, 988 F.3d 618, 624 (2d Cir. 2021) (reviewing a petition to vacate and a cross-petition to confirm); *c.f.*, *Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc*., 23 F.3d 41, 43 (2d Cir. 1994) (finding that the trial court properly treated a "petition to partially vacate the arbitration award" like a motion).

*Third*, the district courts in this Circuit have routinely rejected attempts by defendants to erect a procedural bar to arbitration based on the nomenclature used to refer to the FAA court application for *vacatur* or confirmation. *See, e.g.*, *Orange & Rockland Utilities, Inc. v. Loc. 503, Int'l Bhd. of Elec. Workers*, No. 05-CV-6320, 2006 WL 1073049, at \*2 (S.D.N.Y. Apr. 21, 2006) (rejecting argument that "plaintiff's filing of a Complaint, instead of a motion to vacate, is fatal to its action"); *Nat'l Hockey League v. Nat'l Hockey League Players' Ass'n*, No. 16-CV-4287, 2017 WL 1030718, at \*6 (S.D.N.Y. Mar. 15, 2017) (rejecting argument "that the NHL should have initiated this action as a motion to vacate, rather than as a complaint"); *c.f.*, *U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.,* 188 F. Supp. 2d 358, 363 (S.D.N.Y.), *aff'd,* 51 F. Appx 66 (2d Cir. 2002).[7]

*Fourth*, Conmed filed its Petition with a supporting declaration, exhibits, and a Memorandum of Law. The Petition, and supporting papers, provided notice of the specific relief requested and the particular grounds upon which that relief was being sought. Thus, the Petition, and supporting papers, satisfied all the prerequisites for a motion required by Fed.R.Civ.P. 7(b). *See, e.g.*, *O.R. Sec., Inc. v. Pro. Plan. Assocs., Inc.*, 857 F.2d 742, 746 (11th Cir. 1988) ("[t]he liberality of the...Federal Rules is such that an erroneous nomenclature does not prevent the court from recognizing the true nature of a motion); *ANR Coal Co. v. Cogentrix of N. Carolina, Inc.*, 173 F.3d 493, 497 (4th Cir. 1999) ("No court has held that this sort of mistake forfeits a party's

---

[7] *C.f., Benchmark Elecs., Inc. v. Myers*, No. GJH-19-242, 2019 WL 6528587, at \*5 (D. Md. Dec. 3, 2019) ("The Court sees no reason to 'elevate form over substance' by dismissing Plaintiff's request to vacate based on the labeling of the action.").

right to judicial review when the opposing party fails to demonstrate any prejudice"). To that end, the Local Rules do not require that a "Notice of Motion" take any particular form. *See* Local Rule 7.1(b)(5). *All* that it is required is: "the case caption and docket number, if then known; the supporting papers upon which the motion is based; and the relief demanded and the grounds therefor." *Id. All* of the foregoing information was plainly contained in Conmed's initial filing. *See generally* Dkt. No. 1.

*Fifth,* Respondent's reliance on *Kruse v. Sands Bros. & Co.*, 226 F. Supp. 2d 484 (S.D.N.Y. 2002) does not compel a different result. *Kruse* held that a "Cross–Petition to Vacate is not the legal equivalent of a Motion to Vacate" because a *cross-petition* resulted in an improper shifting of the burden of proof. *See id.* at 487. There has been no attempt here by Conmed to shift the burden of proof to First Choice. *See* Dkt No. 1-25 [Conmed MOL] ("Under these circumstances, Conmed has met its burden of establishing grounds under 9 U.S.C. § 10 to vacate the arbitration award"). Further, subsequent district courts have rejected attempts—like that made by First Choice here—to use the *Kruse* holding to bar otherwise timely filings based on the failure to use "motion" terminology in the filing. *See, e.g.*, *Nat'l Hockey League*, 2017 WL 1030718, at *6 (rejecting *Kruse* as a procedural bar); *Orange & Rockland Utilities, Inc.*, 2006 WL 1073049, at *3 (same).

Finally, *Kruse* is a faulty vehicle for Respondent's argument in any event. *Kruse* relied on the Eleventh Circuit's decision in *O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc.* But in that case, while the Eleventh Circuit agreed that a motion to vacate should not be titled as a "complaint" it nonetheless held that that misnomer should not affect the district court's ability to reach the merits. *O.R. Sec., Inc.*, 857 F.2d at 746. It held that the naming error was inconsequential because the "memoranda of both parties submitted to the district court adequately briefed the

issue of whether the arbitration award in question should have been vacated." *Id.*

### B. The Court was provided with a sufficiently complete record upon which to decide the merits of the Verified Petition.

First Choice also argues that a purported failure to provide a "full copy" of the arbitration record somehow forecloses Conmed's claims. *See* Dkt. No. 47 at Point II(D)(2). This argument incorrectly conflates a *full* record with a *sufficiently complete* record and is without merit.

Conmed was not obligated to provide the *full* record. Rather, as each case cited by First Choice recognizes, Conmed's obligation was to provide a *sufficiently complete* record. *See Green v. Progressive Asset Mgmt., Inc.*, No. 00-CV-2539, 2000 WL 1229755, at *3 (S.D.N.Y. Aug. 29, 2000) ("sufficiently complete record"); *Lew Lieberbaum & Co. v. Randle*, 85 F. Supp. 2d 123, 126 (E.D.N.Y. 2000) (same); *Ahing v. Lehman Bros.*, No. 94CIV.9027(CSH), 2000 WL 460443, at *10 (S.D.N.Y. Apr. 18, 2000) (same); *Commonwealth Associates v. Letsos*, 40 F. Supp. 2d 170, 175 (S.D.N.Y. 1999) (same). Other courts have expressly rejected any suggestion that a full record is required. *See, e.g.*, *Westerbeke Corp. v. Daihatsu Motor Co.*, 162 F. Supp. 2d 278, 283 n.3 (S.D.N.Y. 2001) (rejecting argument that the failure to provide a full record is fatal to a petition to vacate).[8] Respectfully, providing the full arbitration record was entirely unnecessary and would serve only to tax the Court's limited time and resources.

The record provided by Conmed was entirely complete as to the discrete issues raised in the Petition. *See generally* Dkt. No. 1. Conmed's first ground for relief is premised on the position that Arbitrator Singer exceeded his powers under the parties' arbitration provision by failing to recognize the pre-emptive effect of the FAA on his decision regarding choice of law. That issue is a question of law based on entirely on the language of the parties' agreements. Those agreements were provided as part of the record attached to the Petition, along with the

---

[8] *rev'd on other grounds*, 304 F.3d 200 (2d Cir. 2002).

Arbitrator's choice-of-law decision. *See* Dkt. Nos. 1-1 [Ex. A], 1-2 [Ex. B], 1-5 [Ex. E]. Thus, the record was sufficiently complete (and, in fact, *full*) as to this issue.

Conmed's second ground for relief raised, in relevant part, two additional discrete grounds that were based on the Arbitrator's findings of fact: (i) that the Arbitrator's implied finding that Conmed had released First Choice's prior actionable conduct was a manifestly disregard of the law; and (ii) the Arbitrator's finding that Conmed's agreement to a payment plan for First Choice negated or excused its prior failure to pay for product was a manifest disregard of the controlling law. Each of these discrete grounds was premised largely on the Arbitrator's findings of fact and the case law or statutory law. *See* Dkt. No. 1-6 [Ex. F], 1-9 [Ex. I], 1-11 [Ex. K], 1-12 [Ex. L], 1-13 [Ex. M]. There is no part of the factual record that is missing that is required to rule on these arguments.

First Choice position relies on case law that is simply inapplicable to these limited grounds on discrete issues. For example, in *Lew Lieberman & Co., Inc. v. Handle*, the arbitrator did not set forth a specific rationale for his decision, and thus the district court was obligated to search the factual record for a basis to support the outcome. 85 F. Supp. 2d at 126. The petitioner produced only an attorney affidavit which contained a "self-serving summary" of the testimony at hearing rather than providing any portions of the transcript of the tape recorded proceedings. *Id*. Here, as an initial matter, the Arbitrator has provided a specific rationale for his decision, and thus the issue discussed above can be evaluated based on the decision itself, and limited additional documents, like the relevant agreements. *Lew Lieberman & Co., Inc.,* is therefore inapplicable. However, it should also be noted that Petitioner has provided numerous transcript excerpts containing relevant aspects of their motion and multiple exhibits. Respondent identified no document, exhibit, or material that is necessary to rule on Petitioner's arguments that is not

part of the record.

Accordingly, the Court has a sufficiently complete record upon which to decide Conmed's petition to vacate on the merits.

### C.  Respondent's argument that Conmed's Petition is time-barred is frivolous

By its procedural arguments, First Choice argues at pp. 29-30 that Conmed's Petition to Partially Vacate the Arbitration Award is somehow time-barred. But First Choice's acknowledges that the Petition on November 18, 2021—8 days after the Arbitrator issued his final award. *See* Dkt No. 47 at pp. 13-14. Thus, this argument is without merit.

## V.     THERE IS NO AUTHORITY FOR FEE SHIFTING FOR VACATUR/CONFIRMATION MOTIONS UNDER THE FAA

First Choice also asserts that the Court should award attorney's fees and costs pursuant to discretionary language contained 10 L.P.R.A. § 278e.[9] *See* Dkt. No. 47 at Point I(E). This argument is too presented without legal support and should be rejected.

Though First Choice unilaterally asserts that this is an action "filed pursuant to the provisions" of Law 75, it does not actually provide the Court with any caselaw that has construed an application for confirmation or *vacatur* under the FAA to be one "filed pursuant to the provisions" of Law 75 for purposes of 10 L.P.R.A. § 278e.[10] The sole case cited by First Choice, *Casco, Inc. v. John Deere Constr. & Forestry Co.,* 2022 WL 1090559, at *7 (D.P.R. Mar. 31, 2022) was not brought pursuant to the FAA—it was brought by a distributor under Law 75 to preserve a terminated distribution relationship. *Casco* is plainly inapplicable here.

In fact, *Casco* demonstrates why fee-shifting would be inappropriate here. There, the

---

[9] Section 278e provides: "[i]n every action filed pursuant to the provisions of *this chapter*, the court *may allow* the granting of attorney's fees to the prevailing party, as well as a reasonable reimbursement of the expert's fees." P.R. Laws Ann. tit. 10, § 278e (emphasis added).

[10] Nor is there any fee shifting provision in the FAA that would allow First Choice to recover its attorney's fees for filing a Petition to confirm an arbitration award. *Relative to arbitration*, the parties' agreed: "each party shall bear its own costs and attorneys' fees."

district court examined the legislative intent for adding 10 L.P.R.A. § 278e and indicated that the overarching objective of the discretionary fee-shifting provision was the same as Law 75 itself— "to facilitate and promote plaintiffs' vindication of their rights vis-à-vis a historically stronger opponent, when the latter has impermissibly encroached on those rights." *Id.* Thus, the caselaw cited by First Choice recognizes that the statute was intended to reimburse dealers for their fees and costs associated with having to enforce their Law 75 contract rights in court in response to an impairment or an unjust termination. *See. e.g.*, *Johnson & Johnson Int'l v. Puerto Rico Hosp. Supply, Inc.*, 405 F. Supp. 3d 333, 338 (D.P.R. 2019).

As First Choice must acknowledge, the distribution relationship has not been impaired or otherwise terminated *See* Dkt. No. 47 at p. 13 ("As of the date of filing of this Cross-Petition, Conmed still maintains First Choice as its distributor in Puerto Rico."). Rather, Conmed chose to arbitrate its contractual rights regarding choice-of-law and the existence of just cause, *without terminating* the parties' relationship or forcing First Choice to go to court to preserve the parties' relationship. Even were this proceeding not brought exclusively under the FAA, Conmed still cannot be said to have triggered the discretionary Law 75 fee-shifting provisions when it has not encroached on First Choice's rights. Thus, the Law 75 fee shifting provision has no applicability to this suit and First Choice's request should be summarily rejected.

## VI.    First Choice's REMAINING ARGUMENTS ARE WITHOUT MERIT.

### A. *There is no merit to the claim that Conmed's Petition is "moot" by virtue of First Choice's payment of the outstanding debt.*

First Choice argues that its payment of the outstanding debt renders Conmed's Petition "moot." Dkt. No. 47 at Point II(B)(2). This incorrectly presupposes that the *only* dispute existing for the Court to consider is "related to debt," which became "when the underlying debt…is fully paid." *Id.* This argument misconstrues the Petition.

{H4839688.5}                                        22

As this Court has recognized, "'[a] case is moot when the parties lack a legally cognizable interest in the outcome'" *Essex One, LLC v. Town of Essex-Town of Essex Plan. Bd.*, No. 20-CV-00119, 2020 WL 4924576, at *8 (N.D.N.Y. Aug. 21, 2020) (Sannes, J.) (quoting *Chevron Corp. v. Donziger*, 833 F.3d 74, 123-24 (2d Cir. 2016)).[11] "'As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (quoting *Chevron*, 833 F.3d at 124) (internal quotations omitted). For example, in *Powell v. McCormack*, the Supreme Court recognized that where some—but not all—issues in a controversy become moot, "the remaining live issues supply the constitutional requirements of a case or controversy" regardless of whether the remaining issues are "secondary." 395 U.S. 486, 496–97 (1969); *see also, e.g., Unite Here Loc. 1 v. Hyatt Corp.*, 862 F.3d 588, 598 (7th Cir. 2017) (so long as there was "something of value," petitioner could gain in arbitration confirmation proceeding, there existed a case or controversy); *Ryan v. City of Shawnee*, 13 F.3d 345, 350 (10th Cir. 1993) (the plaintiff's reinstatement and backpay did not moot his Title VII action because there was still additional relief that could be obtained *via* the court action).

Here, as has been set forth through Conmed's papers, the Petition challenges two discrete issues: (i) the choice-of-law determination; and (ii) the Arbitrator's excusal of the existing "just cause" to terminate the parties' relationship. *See* Dkt. No. 1 [Pet.] ¶¶ 6-55. Neither issue was eliminated by virtue of First Choice's decision to pay off its outstanding debt which occurred after the arbitration award—that issue simply has not been challenged by virtue in Conmed's Petition, which is, by definition, a challenge to the Arbitrator's rulings. In fact, it is fair to say that any issue regarding the *amount* of First Choice's debt or its obligation to pay that debt were stipulated to at the arbitration, and were not materially in dispute. *See* Dkt. No. 1-6 at p. 8 ("Such

---

[11] Stated alternatively, a case is moot "'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Essex One, LLC.*, 2020 WL 4924576, at *8 (quoting *Chevron*, 833 F.3d at 124).

amount was reduced to $151,492.96 as of October 25, 2021.").

First Choice decision to pay its debt does not impact, or "moot," the two specific challenges to the final award. Thus, Conmed retains a legally cognizable interest in the vacating the two grounds that it challenges vis-à-vis the Petition. *See Essex One, LLC.*, 2020 WL 4924576, at *8 (a case is moot "'*only* when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" (emphasis added)).

### B.   *The equitable doctrines raised by First Choice are unavailing and do not apply.*

First Choice argues that because Conmed has not terminated its relationship with First Choice to date—and "there is nothing stopping Conmed from terminating" now—Conmed is equitably prevented by "congeries of related doctrines"[12] from pursing its Petition. This position is nonsensical.

"Judicial estoppel allows a court to preclude a party from raising an argument inconsistent with a prior position it took before the court." *Union Internacional UAW, Loc. 2415 v. Bacardi Corp.*, 8 F.4th 44, 53 (1st Cir. 2021) (citing *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987)). One treatise explained that the doctrine "arises only from a position taken in an adjudicatory proceeding," 18B Fed. Prac. & Proc. Juris. § 4477 (3d ed.) and it is "irrelevant to the arbitration process[.]" *Union Internacional*, 8 F.4th at 53.

But even assuming it were not immaterial, the doctrine, on its face, still does not apply. Judicial estoppel—like the doctrine precluding inconsistent positions and *doctrina de actos propios* (*i.e.*, the doctrine of one's own acts)—it is intended to prevent "a litigant from pressing a claim that is *inconsistent* with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." *InterGen N.V. v. Grina*, 344 F.3d 134, 144

---

[12] 18B Fed. Prac. & Proc. Juris. § 4477 (3d ed.).

(1st Cir. 2003) (emphasis added).[13] But this is not a situation in which Conmed has adopted one position, secured a *favorable* decision from arbitration, and then taken a contradictory position in search of legal advantage before this Court. In fact, Conmed has never even changed its position—let alone taken an inconsistent position. It was simply unsuccessful in arbitration and now challenges that outcome through the appropriate FAA process. Accordingly, this argument too is without merit.

## CONCLUSION

For all of the foregoing the reasons, First Choice's Cross-Petition is wholly without merit and must be denied, while Conmed's Petition must be granted.

Dated: September 7, 2022                          Respectfully submitted,
          Syracuse, New York

                                        By: _____
                                        HANCOCK ESTABROOK LLP
                                        John G. Powers, Esq. (508934)
                                        Mary L. D'Agostino, Esq. (520301)
                                        1800 AXA Tower I
                                        100 Madison St.
                                        Syracuse, NY 13202
                                        (315) 565-4500

                                        COUNSEL FOR PETITIONER
                                        CONMED CORPORATION

---

[13] Because the root purpose is to ensure that parties proceed without making improper use of the court system, it is generally only invoked "when a litigant is playing fast and loose with the courts"—and not otherwise. *Patriot Cinemas*, 834 F.2d at 212.