**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CONMED CORPORATION,

|  |  |  |
|---|---|---|
|  | Petitioner-Cross-Respondent, | 6:21-cv-1245 (BKS) |

v.

FIRST CHOICE PROSTHETIC & ORTHOPEDIC
SERVICE, INC.,

|  |  |
|---|---|
|  | Respondent-Cross-Petitioner. |

**Appearances:**

*For Petitioner-Cross-Respondent:*
John G. Powers
Mary L. D'Agostino
Hancock Estabrook LLP
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

Daniel S. Jonas, General Counsel
Erica Visokey, Assistant General Counsel
Conmed Corporation
525 French Road
Utica, NY 13502

*For Respondent-Cross-Petitioner:*
Gabriel M. Nugent
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

Luis A. Meléndez Albizu
Luis A. Meléndez Albizu & Assoc., PSC
Cobián Plaza, Suite 121
1607 Avenida Ponce de León
San Juan, Puerto Rico 00912

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On November 18, 2021, Petitioner and Cross-Respondent Conmed Corporation filed a

verified petition pursuant to Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, to

partially vacate an arbitration award associated with an arbitration that occurred between

Conmed and Respondent and Cross-Petitioner First Choice Prosthetic & Orthopedic Service, Inc.

("First Choice"). (Dkt. No. 1). First Choice filed an answer to Conmed's petition and a cross-

petition pursuant to 9 U.S.C. § 9 to confirm the arbitration award on August 8, 2022. (Dkt. No.

43).[1] The parties' petitions are fully briefed. (*See* Dkt. Nos. 44, 47, 52, 60). For the following

reasons, the Court denies Conmed's petition to vacate and grants First Choice's cross-petition to

confirm the arbitration award.

## II.    BACKGROUND[2]

### A.    The Parties' Contractual Relationship

Conmed is a corporation "engaged in the manufacture, distribution and sale of a variety

of medical devices" in the United States and abroad. (Dkt. No. 1, ¶ 1).[3] First Choice is a Puerto

Rican corporation engaged in the business of distributing and selling medical products in Puerto

Rico. (*Id.* ¶ 2). On November 17, 2014, the parties entered into a sales authorization letter (the

"2014 SAL"). (Dkt. No. 1-1). The 2014 SAL authorized First Choice to sell Conmed's "Sports

---

[1] First Choice initially moved to dismiss the petition on grounds of mootness, lack of personal jurisdiction, and improper venue, (Dkt. No. 25), but later withdrew its motion and waived its objections to personal jurisdiction and venue, (*see* Dkt. Nos. 37, 38).

[2] The facts are drawn from Conmed's verified petition, First Choice's verified cross-petition, and the exhibits submitted in connection therewith. (Dkt. Nos. 1, 3, 4, 43, 44).

[3] During most of the relevant time period, Conmed was a corporation incorporated in the state of New York with its headquarters in Utica, New York. (Dkt. No. 1, ¶ 1). In early 2020, Conmed changed its state of incorporation to Delaware, and on January 1, 2021, it moved its corporate headquarters to Largo, Florida. (*Id.*).

2

Medicine, Power Arthroscopy and 2D Visualization Products" in Puerto Rico and stated that this authorization was valid for a one-year term. (*Id.*). Disputes between the parties arose, including about the exclusive or non-exclusive nature of First Choice's authorization, First Choice's failure to make payments or timely payments, and lack of adequate customer service. (*See generally* Dkt. No. 1-6 (arbitrator's final award)).[4]

The parties subsequently executed another sales authorization letter effective December 20, 2018 through December 31, 2019 (the "2019 SAL"). (Dkt. No. 1-2). The 2019 SAL authorized First Choice the exclusive right to sell Conmed sports medicine products in Puerto Rico and the nonexclusive right to sell Conmed "Ortho Power" products in Puerto Rico. (*Id.* at 2). Given First Choice's arrearages, the 2019 SAL also provided that the "overall debt balance owed to Conmed after recent video adjustments is $325,000. This balance could be further reduced by ~$30K for the 4th outstanding video tower on consignment at Bella Vista Hospital." (*Id.* at 4). First Choice agreed to pay Conmed "$6,000 on or before the 15th day of each month beginning on January 15, 201[9]" until its balance was paid off. (*Id.*). The agreement set forth "reasonable purchase targets" and provided that First Choice's failure to achieve the purchase targets or make the $6,000 monthly payments allowed Conmed to terminate the agreement immediately. (*Id.* at 2–3). Either party was permitted to terminate the agreement "for any reason or for no reason, upon ninety (90) days written notice to the other party." (*Id.* at 3).

The 2019 SAL contains an arbitration provision, which provides in relevant part:

> Except for actions by CONMED for collection of monies or disputes involving intellectual property rights, all disputes, including disputes as to arbitrability, arising out of or relating to this Agreement or the rights and obligations of the parties shall be submitted to arbitration under the Commercial Arbitration Rules of

---

[4] Conmed's petition expressly "assumes the correctness of the Arbitrator's factual findings." (Dkt. No. 1, ¶ 46 n.1; *see also* Dkt. No. 1-25, at 11).

the American Arbitration Association ("AAA") prevailing at the
time (the Rules); provided, however, that in the event of a conflict
between such Rules and this Agreement, the latter shall control.
There shall be a single arbitrator, who shall be a resident of New
York, NY. . . . The place of arbitration shall be New York, NY. This
Agreement and the rights and obligations of the parties hereunder
shall in all respects be governed by and interpreted, construed, and
enforced in accordance with, and any arbitration hereunder shall
apply, the laws of the State of New York, without giving effect to
conflicts of law principles.

(*Id.* at 3–4).[5]

## B.    The Arbitration

### 1.    The Arbitration Demand

On November 16, 2020, Conmed filed a demand for arbitration with the American

Arbitration Association. (Dkt. No. 1-3). Conmed's demand complained of First Choice's alleged

failure to meet its purchase targets and make required debt repayments. (*Id.* at 34). Conmed

sought a declaration that "the merits of this arbitration, and the parties' rights and obligations

under the Subject Agreements shall be determined under New York substantive law" and that

"Conmed is entitled under the Subject Agreements to terminate the parties' contractual

relationship immediately, without penalty," as well as damages in the amount of $187,492.96 for

unpaid amounts. (*Id.* at 35–36). First Choice responded to Conmed's demand. (Dkt. No. 1-4).

Attorney David C. Singer, an attorney based in New York, New York, was selected as

the arbitrator. (Dkt. No. 1, ¶ 8; Dkt. No. 43-1, at 27–43).

### 2.    The Choice-of-Law Decision

From the outset of the arbitration proceedings, the parties disputed which substantive law

would apply, and they submitted the issue to the arbitrator. (*See* Dkt. Nos. 1-7, 1-8, 1-9, 1-11, 1-

---

[5] The agreement also provides that the arbitrator's award "may be enforced in any court of competent jurisdiction."
(*Id.* at 4).

12, 1-13 (the parties' briefing on the choice-of-law issue)). On June 30, 2021, the arbitrator

issued an order regarding choice of law (the "Choice-of-Law Decision"). (Dkt. No. 1-5). After

quoting the relevant provision from the 2019 SAL providing that "any arbitration hereunder shall

apply, the laws of the State of New York, without giving effect to conflicts of law principles,"

the arbitrator noted as an initial matter that the parties had requested that he decide whether New

York or Puerto Rico law applied and "agree[d] that the Arbitrator has the authority to decide this

issue." (*Id.* at 2–3).

The arbitrator next rejected First Choice's argument that the 2019 SAL was a contract of

adhesion and therefore that the choice-of-law provision was unenforceable. (*Id.* at 3). The

arbitrator reasoned that both parties are "sophisticated corporate entities" and that there was no

evidence presented to establish that the agreement "was not knowingly and freely entered into."

(*Id.*).

The arbitrator next considered Puerto Rico's Dealer's Act (known as "Law 75") and its

applicability to the parties' agreement. (*Id.* at 3–4). Law 75 applies to dealer's contracts, defined

as a "[r]elationship established between a dealer and a principal or grantor whereby . . . the

former actually and effectively takes charge of the distribution of a merchandise, or of the

rendering of a service, by concession or franchise, on the market of Puerto Rico." P.R. Laws

Ann. tit. 10, § 278(b). Law 75 further provides:

> The dealer's contracts referred to in this chapter shall be interpreted
> pursuant to and ruled by the laws of the Commonwealth of Puerto
> Rico, and any other stipulation to the contrary shall be void.
>
> Any stipulation that obligates a dealer to adjust, arbitrate or litigate
> any controversy that comes up regarding his dealer's contract
> outside of Puerto Rico, or under foreign law or rule of law, shall be
> likewise considered as violating the public policy set forth by this
> chapter and is therefore null and void.

*Id.* § 278b-2. The law also states that its provisions "are of a public order and therefore the rights determined by such provisions cannot be waived." *Id.* § 278c. The arbitrator held that it was "clear that Puerto Rico has a strong public policy that relates to the termination of [First Choice's] dealership, as evidenced by Law 75." (Dkt. No. 1-5, at 3). By contrast, the arbitrator determined that New York "has no such public policy interest in this matter" and that New York's "contacts with this case are minimal." (*Id.* at 3–4 (noting that Conmed was based in Florida during the relevant time period and that First Choice does no business in New York)). The arbitrator found Puerto Rico's contacts to be "extensive" and that Puerto Rico had a "more significant connection to the relationship between the parties and the facts relating to this case than New York." (*Id.* at 4 (noting that Puerto Rico is where First Choice is located, orders were placed, delivery of products was made, and products were sold)). The arbitrator therefore determined that Puerto Rico law should apply, citing cases where "New York federal courts have directed the application of Puerto Rican law, specifically Law 75, in circumstances where New York or some other state law was expressly provided for in the operative agreement." (*Id.* at 4–5 (citing *Caribbean Wholesales & Serv. Corp. v. US JVC Corp.*, 855 F. Supp. 627 (S.D.N.Y. 1994); *Southern Int'l Sales Co. v. Potter & Brumfield Div. of AMF Inc.*, 410 F. Supp. 1339 (S.D.N.Y. 1976))).

Finally, the arbitrator considered Conmed's argument that the FAA preempts Law 75 to the extent it requires application of Puerto Rico law to the parties' dispute. (*Id.* at 5). The arbitrator noted that the "purpose of the FAA is to ensure that agreements to conduct private arbitrations are enforced." (*Id.*). He determined, however, that the "governing law provision of Law 75 does not disproportionately apply to arbitration agreements" and that a "party cannot insulate itself from the governing law that otherwise would apply simply through the inclusion of

an arbitration clause in an agreement." (*Id.*). Finally, the arbitrator distinguished the caselaw on which Conmed relied involving "class action waivers and other arbitration rules." (*Id.*). He determined that such rules "generally are not viewed as substantive non-waivable law," whereas Law 75 "is the mandatory law of Puerto Rico." (*Id.*).

### 3.    The Arbitration Record

The arbitrator held a three-day evidentiary hearing over Zoom on July 27, 28, and 30, 2021. (Dkt. No. 1, ¶ 29; Dkt. No. 4 (transcript of arbitration hearing)). Conmed offered evidence through the Declaration of Andreea Teodorescu, its Regional Business Manager for the Caribbean Region, with Exhibits 1 through 45. (Dkt. No. 1, ¶ 30; *see* Dkt. Nos. 1-14, 1-15, 1-16, 1-17). First Choice offered evidence through the Affidavit of Mario García, its President, together with 72 exhibits. (Dkt. No. 43-1, at 18–19; *see* Dkt. Nos. 1-18, 44-1 through 44-71). Both Ms. Teodorescu and Mr. García testified at the hearing. (*See generally* Dkt. No. 4). The parties then submitted post-hearing briefing regarding the issues in dispute. (*See* Dkt. Nos. 1-20, 1-21, 1-22, 1-23).

### 4.    The Final Award

The arbitrator issued his final award (the "Final Award") on November 10, 2021. (Dkt. No. 1-6).

#### a.    Factual Findings

After reciting the case's procedural history, the arbitrator made the following findings of facts. Conmed and First Choice entered into the 2014 SAL in November 2014. (*Id.* at 4). The 2014 SAL did not include an arbitration clause, sales targets, or representations regarding exclusivity. (*Id.*). First Choice believed that the "distributorship was intended to be exclusive from the beginning," and first learned that it was not exclusive in 2016. (*Id.* at 4–5). First Choice

represented that it invested approximately $250,000 in the business since beginning its

contractual relationship with Conmed. (*Id.* at 5).

 "Over time," the arbitrator found, "First Choice did not pay for Products that it purchased

from Conmed." (*Id.*). As of September 30, 2018, First Choice owed Conmed $443,804.15 for

products it had purchased, and Conmed began requiring that First Choice pay for products upon

purchase instead of within 90 days of the issuance of an invoice. (*Id.*). Conmed also required

First Choice to make monthly payments in the amount of $12,000 to reduce its arrearages. (*Id.*).

 The parties then entered into the 2019 SAL, which applied to the period from December

20, 2018 to December 31, 2019. (*Id.*).[6] Under the 2019 SAL, which did provide for arbitration of

disputes: (1) First Choice "became the exclusive distributor in Puerto Rico of Conmed's sports

medicine" products; (2) First Choice "continued as a non-exclusive distributor of Conmed's

orthopedic power" products; (3) First Choice was "subject to annual purchase targets of

$275,000 for sports medicine Products and $175,000 for orthopedic power Products"; (4) First

Choice was required to make monthly payments of $6,000 to pay down its accumulated

arrearages; (5) First Choice was required to pay for all future purchases of products in cash and

in advance; (6) the parties may terminate the agreement upon 90 days' written notice "for any

reason or no reason" and Conmed may terminate immediately in certain specified situations; and

(7) the parties specified that First Choice's "overall debt balance" was $325,000. (*Id.* at 5–6). In

April 2019, First Choice had reduced its arrearages to $268,492.96. (*Id.* at 6).

 The arbitrator further found that Mr. García had "conveyed to Conmed various reasons

why, in his view, sales of Conmed Products were not higher." (*Id.*). These reasons included

---

[6] The arbitrator found that a SAL was prepared by Conmed for 2020 but never signed, and that no SAL was prepared
for 2021. (*Id.*).

"weakness in the Puerto Rican market, natural catastrophes such as hurricanes, unavailable or delays in delivery of Products, dissatisfaction among doctors with Conmed Products, and difficulties with insurance reimbursement." (*Id.* at 6–7). Puerto Rico experienced Hurricane Maria in 2017, earthquakes in December 2019, and the Covid-19 pandemic beginning in March 2020. (*Id.* at 5, 7). "First Choice's business was harmed as a result, and it was unable to meet its $6,000 monthly payment obligations pursuant to the 2019 SAL." (*Id.* at 7). Conmed agreed to "pause" the monthly payments for April and May 2020. (*Id.*). In the summer of 2020, the parties "negotiated a new arrangement, pursuant to which First Choice's monthly payments . . . w[ere] reduced to $3,000." (*Id.*). Although the parties were to "revisit the monthly payments" in October 2020, they had not revisited the issue as of the time of the arbitration hearing. (*Id.*).

Finally, the arbitrator found that First Choice had reduced its arrearages owed to Conmed to $151,492.96 as of October 25, 2021. (*Id.* at 8). Neither party had terminated the contractual relationship, and First Choice "continue[d] to serve as distributor of Conmed Products in Puerto Rico." (*Id.*). "As recently as November 2020, Conmed confirmed in writing to First Choice that it was not terminating First Choice as its distributor." (*Id.*).

### b.    Adjudication of Conmed's Claims

The arbitrator then addressed Conmed's "claims that First Choice's failure to meet its purchase targets, historical failure to pay[] invoices, bounced checks, lack of adequate customer service, and lack of integrity and honesty in its commercial dealings provide[d] it with sufficient bases to terminate its contractual relationship with First Choice, without penalty," under Law 75. (*Id.*). Law 75 provides:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause.

P.R. Laws Ann. tit. 10, § 278a. "Just cause" is defined as the "[n]onperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service." *Id.* § 278(d).

In assessing whether Conmed had just cause to terminate its contractual relationship with First Choice, the arbitrator noted that "most" of Conmed's allegations in this regard were "not recent." (Dkt. No. 1-6, at 8). For example, non-payment for products "occurred in 2017 and earlier and ceased to accrue by the time of the 2019 SAL," bounced checks "almost all occurred in 2017," and certain "alleged customer dissatisfaction with First Choice occurred in 2018." (*Id.* at 8–9). The arbitrator found that "[t]hese issues largely were explained, corrected [and/or] resolved by the time of, or as part of, the 2019 SAL," which explicitly states that it "represent[s] the entire agreement between the parties . . . and supersede[s] all prior discussions, negotiations and preliminary agreements." (*Id.* at 9). Accordingly, the arbitrator held that issues arising "prior to the 2019 SAL [were] not determinative in this Arbitration." (*Id.*).

The arbitrator next addressed Conmed's argument that under the 2019 SAL it was entitled to terminate the relationship with First Choice immediately if First Choice failed to achieve its purchase targets or failed to make the $6,000 monthly payments. (*Id.*). With regard to missed sales targets, the arbitrator stated: "It is undisputable that, if sales targets set forth in the 2019 SAL were not met, such failure was caused, at least in part, by the unanticipated natural disasters and catastrophic [e]ffects in Puerto Rico of COVID-19." (*Id.*).

With regard to arrearages, which the arbitrator characterized as the "core issue in this Arbitration," the arbitrator first recognized that Law 75 "provides that the failure to pay for product received constitutes just cause for termination of a distribution agreement." (*Id.* at 9–10).

The arbitrator determined that the 2019 SAL "resolved previously unresolved issues and provided a payment plan to address the arrearages going forward," and that the parties agreed in 2020 to an updated payment plan when compliance with the 2019 SAL payment plan "became impossible due to the pandemic." (*Id.* at 10).

The arbitrator then determined that, since entering into the 2019 SAL until July 2020, First Choice paid Conmed $103,500 to reduce its arrearages. (*Id.*). Had First Choice paid $6,000 each month throughout that time period, except for the agreed-to two-month "pause" in April and May 2020 due to the pandemic, First Choice would have paid a total of $102,000. (*Id.*). Thus, the arbitrator determined that First Choice had "paid all that it was required to pay under the 2019 SAL" and had actually "overpaid the amount of $1,500." (*Id.*). The arbitrator further determined that, for the period from August 1, 2020 through October 25, 2021, First Choice paid $42,750 towards its arrearages. (*Id.*). Had First Choice made monthly payments of $3,000 throughout this period, as the parties agreed in the summer of 2020, it would have paid a total of $45,000—$2,250 more. (*Id.*). The arbitrator therefore determined that First Choice had underpaid Conmed "from the date of the 2019 SAL through October 25, 2021" the amount of $750, which did "not warrant termination of the contractual relationship between the Parties." (*Id.* at 11).

Based on the above determinations, the arbitrator ordered First Choice to pay Conmed $3,750 by November 30, 2021, representing "the monthly payment requirement of $3,000 under the 2020 Arrangement, plus the $750 underpayment." (*Id.*). First Choice was directed to thereafter "resume making monthly payments to Conmed of $6,000" beginning in December 2021 and continue doing so until "the arrearages are paid off in full." (*Id.*; *see id.* at 12–13).

### III.     SUBJECT MATTER JURISDICTION

The FAA "bestow[s] no federal jurisdiction" on federal courts. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581–82 (2008). Rather, a federal court "may entertain an action brought under the FAA only if the action has an 'independent jurisdictional basis.'" *Badgerow v. Walters*, 142 S. Ct. 1310, 1316 (2022) (quoting *Hall St. Assocs.*, 552 U.S. at 582). In *Vaden v. Discover Bank*, the Supreme Court held that the text of Section 4 of the FAA, which allows a party to petition a federal district court for an order compelling arbitration, "instructs a federal court to 'look through' the petition [to compel arbitration] to the 'underlying substantive controversy' between the parties—even though that controversy is not before the court." *Id.* at 1314 (quoting *Vaden*, 556 U.S. 49, 62 (2009)). However, in *Badgerow*, the Court held that the same "look-through" approach to determining jurisdiction does not apply to requests to confirm or vacate arbitral awards under FAA Sections 9 and 10. *Id.*[7] Instead, in those situations "a court may look only to the application actually submitted to it in assessing its jurisdiction." *Id.*

Because *Badgerow* was decided after Conmed filed its petition, and cognizant of the Court's obligation to ensure it has subject matter jurisdiction over this action, the Court sua sponte raised the issue of subject matter jurisdiction and directed the parties to file letter briefs. (Dkt. No. 61). In response, Conmed argues that this Court has both federal question and diversity jurisdiction. (Dkt. No. 62).[8] While First Choice disputes that federal question jurisdiction exists, it agrees with Conmed that this Court has diversity jurisdiction. (Dkt. No. 63).

---

[7] Prior to *Badgerow*, the Second Circuit had applied the "look-through" approach to jurisdiction to applications to confirm or vacate an arbitral award. *See Badgerow*, 142 S. Ct. at 1315 n.1 (citing *Doscher v. Sea Port Grp. Secs., LLC*, 832 F.3d 372, 381–88 (2d Cir. 2016)).

[8] Conmed's petition did not expressly allege that this Court has federal question jurisdiction, instead relying on diversity jurisdiction. (Dkt. No. 1, ¶ 14). Although the petition also asserted jurisdiction under 9 U.S.C. § 203, that provision does not apply to an arbitral award arising out of a relationship which is "entirely between citizens of the United States," 9 U.S.C. § 202, and Conmed did not press Section 203 as a jurisdictional basis in its letter briefing.

The diversity jurisdiction statute grants the federal courts jurisdiction over civil actions "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs," and is between "citizens of different States." 28 U.S.C. § 1332(a)(1); *see id.* § 1332(e) (defining "States" to include "the Commonwealth of Puerto Rico" for purposes of Section 1332). The existence of jurisdiction is assessed at the time the action is filed. *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991). Here, the parties are citizens of different States: Conmed is a corporation incorporated in Delaware with its principal place of business in Florida, and First Choice is a corporation incorporated in the Commonwealth of Puerto Rico with its principal place of business in Puerto Rico. (Dkt. No. 1, ¶¶ 1–2; Dkt. No. 43-1, at 12). Thus, the parties are completely diverse.

The Court must next assure itself that the amount-in-controversy requirement is satisfied.[9] *Badgerow* did not provide any guidance on how to measure the amount in controversy for a petition to vacate or confirm an arbitration award, and the Second Circuit has not expressly addressed the issue. Prior to *Badgerow*, district courts in this Circuit used either a "demand" or "award" approach. *See Legacy Agency, Inc. v. Scoffield*, 559 F. Supp. 3d 195, 204 (S.D.N.Y. 2021). "The 'demand' approach construes the amount a party demanded in the underlying arbitration as the amount in controversy. The 'award' approach instead construes the amount awarded as the amount in controversy." *Id.* (quoting *Erdheim v. Harris*, No. 10-cv-8601, 2019 WL 3219385, at *2, 2019 U.S. Dist. LEXIS 119104, at *5 (S.D.N.Y. July 17, 2019)). As Conmed concedes, the "demand" approach appears to be similar to the "look through" approach that the Supreme Court held impermissible in *Badgerow*. (Dkt. No. 62, at 6); *see Mitchell v.*

---

[9] Conmed argues in its letter brief that its petition "alleges in good faith that the amount in controversy exceeds $75,000" and that this allegation creates a presumption that the amount-in-controversy requirement is satisfied. (Dkt. No. 62, at 4). However, the petition clearly alleges that the "amount in controversy *at the arbitration* well exceeded $75,000.00, exclusive of costs, interest, and attorneys' fees." (Dkt. No. 1, ¶ 13 (emphasis added)).

*Frattini*, No. 22-cv-2352, 2022 WL 17157027, at *3, 2022 U.S. Dist. LEXIS 211932, at *8 (S.D.N.Y. Nov. 22, 2022) (refusing, after *Badgerow*, to "look through" the $25,450 arbitration award "to find that the underlying arbitration involved an amount-in-controversy greater than $75,000").[10]

Here, the Final Award held that Puerto Rico law "governs the parties' right[s] and obligations under the relevant agreements" and directed First Choice "to pay $3,750 by November 30, 2021 and resume monthly payments to Conmed of $6,000, commencing December 2021, until the outstanding arrearages have been paid in full to Conmed." (Dkt. No. 1-6, at 12). The arbitrator had found that First Choice owed Conmed "$151,492.96 as of October 25, 2021." (*Id.* at 8). The parties therefore agree that the amount of the Final Award which Conmed seeks to have vacated is sufficient to support diversity jurisdiction. (Dkt. No. 62, at 6; Dkt. No. 63, at 7). Conmed also argues that the arbitration award and the relief it seeks before this Court capture the value of the parties' distribution relationship because, "if the choice of law decision is [vacated], Conmed will be permitted to terminate the parties' distribution relationship, which produced revenue well over the jurisdictional minimum each year." (Dkt. No. 62, at 6 (citing, inter alia, Dkt. No. 1-14, at 14 (First Choice sales data from 2015–2021))). "When a petitioner seeks confirmation or vacatur of an award, without seeking a remand for further arbitration proceedings, 'the amount in controversy is the value of the award itself to the petitioner.'" *Wise v. Marriott Int'l, Inc.*, No. 06-cv-11439, 2007 WL 2200704, at *4, 2007 U.S. Dist. LEXIS 55611, at *11–12 (S.D.N.Y. July 30, 2007) (citation omitted); *Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 757 F. Supp. 283, 286 (S.D.N.Y. 1991) ("In this action to

---

[10] The amount-in-controversy requirement would be met here under the demand approach. Conmed's demand for arbitration requested, in addition to a declaratory judgment, damages in the amount of $187,492.96. (Dkt. No. 1-3, at 35–36).

vacate the arbitration award the amount in controversy may be regarded as either the value to

plaintiff of the relief sought or the loss to defendant if the relief is granted."). Thus, the amount-

in-controversy requirement is satisfied.

The Court therefore concludes that it has jurisdiction over this matter pursuant to 28

U.S.C. § 1332(a)(1)[11] and will proceed to consider the merits of the parties' petitions.[12]

## IV.    STANDARD OF REVIEW

The FAA "is an expression of 'a strong federal policy favoring arbitration as an

alternative means of dispute resolution.'" *Ross v. Am. Express Co.*, 547 F.3d 137, 142 (2d Cir.

2008) (citation omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011)

("The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements

according to their terms so as to facilitate streamlined proceedings."). Under Section 10 of the

FAA, a court "may make an order vacating [an arbitration] award upon the application of any

party to the arbitration" on the basis of four enumerated grounds. 9 U.S.C. § 10(a). The four

grounds for vacatur are: (1) "where the award was procured by corruption, fraud, or undue

means"; (2) "where there was evident partiality or corruption in the arbitrators"; (3) "where the

arbitrators were guilty of misconduct . . ."; and (4) "where the arbitrators exceeded their powers,

or so imperfectly executed them that a mutual, final, and definite award upon the subject matter

submitted was not made." *Id.* § 10(a)(1)–(4). In the Second Circuit, an arbitrator's "'manifest

---

[11] The Court therefore does not reach the question whether it has federal question jurisdiction, a point on which the parties disagree. And because the Court agrees with both parties that there is diversity jurisdiction, Conmed's request for oral argument on this issue, (Dkt. No. 62, at 7), is denied.

[12] First Choice also argues that "the part of Conmed's Petition meant to collect on" the debt First Choice owed is moot because First Choice fully paid its debt on March 29, 2022. (Dkt. No. 47, at 34–36). However, as Conmed responds, First Choice's payment of its debt does not impact "the two specific challenges" Conmed raises to the Final Award. (Dkt. No. 52, at 24–26). Because the parties retain a "legally cognizable interest in the outcome," *Chevron Corp. v. Donziger*, 833 F.3d 74, 123–24 (2d Cir. 2016) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)), this case is not moot.

disregard' of the law or of the terms of the arbitration agreement '[is] a valid ground for vacating arbitration awards" as a "judicial gloss on the specific grounds for vacatur of arbitration awards" enumerated in the FAA. *Seneca Nation of Indians v. New York*, 988 F.3d 618, 625 (2d Cir. 2021) (brackets and citation omitted).[13]

Section 9 of the FAA allows a party, "at any time within one year after [an arbitration] award is made," to apply for a court order confirming the arbitration award. 9 U.S.C. § 9. Upon the party's application, "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§ 10, 11]." *Id.*; *see also Hall St. Assocs.*, 552 U.S. at 582. "Normally, confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (citation and internal quotation marks omitted). Only "a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award," and an award should be confirmed "if a ground for the arbitrator's decision can be inferred from the facts of the case." *Id.* (citations and internal quotation marks omitted).

## V.   CONMED'S PETITION TO VACATE

Conmed's petition to vacate seeks an order vacating the arbitrator's Choice-of-Law Decision on the ground that it exceeded the arbitrator's powers, and/or an order vacating the arbitrator's Final Award as being in manifest disregard of clear and applicable legal authority governing the parties' dispute. (Dkt. No. 1, at 12).

---

[13] The Supreme Court has not decided whether "manifest disregard" survives its decision in *Hall Street Associates*, either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010).

### A.        Procedural Issues

Before reaching the merits of Conmed's petition, the Court first addresses First Choice's arguments that Conmed's petition is procedurally defective and should therefore be dismissed. (*See* Dkt. No. 47, at 31–38).

### 1.        Notice of Motion

First Choice argues that Conmed's petition is procedurally defective and should be "summarily denied" for failure to file and serve a "notice of motion to vacate." (Dkt. No. 47, at 31–32). First Choice argues that Section 12 of the FAA and Local Rule 7.1, taken together, required Conmed to serve a "notice of motion." (*Id.*). Conmed responds that Section 12 of the FAA sets forth service, not form, requirements; that courts refer to applications to vacate both as petitions and as motions; and that First Choice was served with all of the information required to be in a notice of motion. (Dkt. No. 52, at 17–21).

Section 12 of the FAA provides: "Notice of a motion to vacate . . . an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. The Court agrees with Conmed that, by its plain terms, Section 12 sets forth service requirements for motions to vacate an arbitration award. (Dkt. No. 52, at 17). However, Section 6 of the FAA provides that "[a]ny application to the court" under the FAA "shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided." 9 U.S.C. § 6; *see Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1714 (2022) ("A directive to a federal court to treat arbitration applications 'in the manner provided by law' for all other motions is simply a command to apply the usual federal procedural rules, including any rules relating to a motion's timeliness.").[14]

---

[14] The Court attaches no significance to Conmed's use of the word "petition" to refer to its application, instead of "motion." *See Dalla-Longa v. Magnetar Capital LLC*, 33 F.4th 693, 694 n.1 (2d Cir. 2022) ("For the purposes of this

First Choice argues that Conmed's petition did not comply with Local Rule 7.1, which governs motion practice in this District. Local Rule 7.1(b) provides that all motions "require a memorandum of law, supporting affidavit when necessary . . . , and proof of service on all the parties." N.D.N.Y. L.R. 7.1(b). All dispositive motions also "require a Notice of Motion." *Id.* The notice of motion must identify "the case caption and docket number, if then known; the supporting papers upon which the motion is based; and the relief demanded and the grounds therefor." N.D.N.Y. L.R. 7.1(b)(5). Here, Conmed did not file or serve a separately styled "notice of motion" (or "notice of petition") with its initial filing. (*See generally* Dkt. No. 1). However, its verified petition contains all of the information the Local Rules require to be contained in a notice of motion. The Court concludes that Conmed's failure to file a separately styled notice of motion does not warrant dismissal of its petition, as dismissal would elevate form required only by the Local Rules over substance, where the issues are fully briefed and where First Choice has shown no prejudice. *Cf. Nat'l Hockey League v. Nat'l Hockey League Players' Ass'n*, No. 16-cv-4287, 2017 WL 1030718, at *6, 2017 U.S. Dist. LEXIS 37546, at *24 (S.D.N.Y. Mar. 15, 2017) ("Even assuming, *arguendo*, that the NHL should have initiated this action as a motion to vacate, rather than as a complaint, the parties have now fully briefed their respective positions on the merits of this action, and there is no reason for the Court not to reach those merits.").[15]

---

Opinion there is no difference between a motion and petition to vacate, and we use the terms interchangeably."); *Seneca Nation of Indians*, 988 F.3d at 624 (reviewing a "petition to vacate the final award" and a "cross-petition[] to confirm the award"). Indeed, First Choice styles its own cross-application as a cross-petition. (Dkt. No. 43). First Choice does not argue that Conmed's petition does not comply with Federal Rule of Civil Procedure 7, which requires a motion to "(A) be in writing unless made during a hearing or trial; (B) state with particularity the grounds for seeking the order; and (C) state the relief sought." Fed. R. Civ. P. 7(b)(1).

[15] *S&O Constr. Servs. v. APS Contracting, Inc.*, No. 18-cv-5836, 2018 WL 6321541, at *1 n.1, 2018 U.S. Dist. LEXIS 205424, at *1 n.1 (S.D.N.Y. Dec. 4, 2018), on which First Choice relies, does not persuade the Court otherwise. There, the district court found the respondent's cross-motion to vacate and/or modify an arbitration award procedurally defective for failure to file a notice of motion under S.D.N.Y. Local Civil Rule 7.1(a), without citing any other

2.      **Completeness of Record**

First Choice also argues that Conmed's failure to file with its petition a full copy of all of the evidence presented to the arbitrator forecloses any claim of manifest disregard of the law. (Dkt. No. 47, at 44–45). First Choice asserts that Conmed's petition attached only 27 of the 72 exhibits First Choice presented to the arbitrator. (*Id.*; *see* Dkt. No. 44). Conmed responds that it was obligated to provide only a "sufficiently complete" record to this Court and that the record provided is sufficiently complete as to the discrete issues raised in its petition to vacate. (Dkt. No. 52, at 21–23). The Court agrees.

First Choice cites cases stating that a "sufficiently complete" record is required for the Court to assess a petition to vacate. *See, e.g.*, *Lew Lieberbaum & Co., Inc. v. Randle*, 85 F. Supp. 2d 123, 126 (E.D.N.Y. 2000) ("The lack of a sufficiently complete record alone is enough to require rejection of the Petitioners' petition. It is the Petitioners' burden to demonstrate manifest disregard of the law, and the failure to offer the entire record leaves the Court unable to exclude the possibility that the award is supported by evidence that the Petitioner has not supplied."); *Green v. Progressive Asset Mgmt., Inc.*, No. 00-cv-2539, 2000 WL 1229755, at *2–3, 2000 U.S. Dist. LEXIS 12428, at *6–8 (S.D.N.Y. Aug. 29, 2000) (same); *Ahing v. Lehman Bros., Inc.*, No. 94-cv-9027, 2000 WL 460443, at *10 n.3, 2000 U.S. Dist. LEXIS 5175, at *30 n.3 (S.D.N.Y. Apr. 20, 2000) (noting that the plaintiff seeking vacatur of an arbitration award "bear[s] the consequences of th[e] less-than-complete record"). At least one district court has expressly rejected the argument that failure to produce the entire record of the arbitration proceedings warrants denial of a motion to vacate. *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 162 F.

---

authority. *Id.* More importantly, however, the cross-petition was clearly "time-barred under the FAA," as it was filed more than three months after the arbitration award was filed. *Id.*

Supp. 2d 278, 283 n.3 (S.D.N.Y. 2001) (finding that the petitioner had satisfied the "sufficiently complete" standard), *rev'd on other grounds*, 304 F.3d 200 (2d Cir. 2002). First Choice points to no authority for the proposition that Conmed's failure to produce every exhibit from the arbitration proceedings necessarily warrants denial of the petition to vacate. Moreover, the Court concludes that the "sufficiently complete" standard—the language of which appears to have originated in *Lew Lieberbaum*—is satisfied here. Conmed's petition raises discrete legal issues and expressly "assumes the correctness of the Arbitrator's factual findings." (Dkt. No. 1, ¶ 46 n.1; *see also* Dkt. No. 1-25, at 11). Conmed asserts that there is "no part of the factual record that is missing that is required to rule on [its] arguments," (Dkt. No. 52, at 22), and First Choice has not pointed to any evidence that Conmed failed to include with its petition which is relevant to Conmed's arguments.

Accordingly, the Court concludes that Conmed's petition is not procedurally defective.[16]

**B.      Choice of Law Decision**

Conmed first argues that the arbitrator's decision holding that Puerto Rico law would apply to the parties' arbitration exceeded his powers and should be vacated under Section 10(a)(4) of the FAA. (Dkt. No. 1-25, at 12–17).

The Second Circuit has "consistently accorded the narrowest of readings to the [FAA's] authorization to vacate awards" pursuant to Section 10(a)(4). *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 220 (2d Cir. 2002) (quoting *In re Andros Compania Maritima,*

---

[16] Nor is Conmed precluded from seeking vacatur by the doctrines of estoppel and inconsistent positions, as First Choice argues. (Dkt. No. 47, at 36–38 (arguing that Conmed has "rejected terminating" First Choice as a distributor)). From the beginning of the arbitration proceedings, Conmed has consistently sought the ability to terminate its distribution relationship with First Choice without penalty. First Choice does not point to any contradictory statements or acts of Conmed on which First Choice has detrimentally relied. *See QBE Seguros v. Morales-Vázquez*, No. 15-cv-2091, 2018 WL 3763305, at *12, 2018 U.S. Dist. LEXIS 133864, at *37–39 (D.P.R. Aug. 7, 2018) (describing the doctrines of equitable estoppel and Puerto Rico's parallel "doctrine of one's own acts").

*S.A.*, 579 F.2d 691, 703 (2d Cir. 1978)). The focus of a court's analysis under Section 10(a)(4) is "on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *Beijing Shougang Mining Inv. Co., Ltd. v. Mongolia*, 11 F.4th 144, 161 (2d Cir. 2021) (citation omitted). "It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." *Stolt-Nielsen*, 559 U.S. at 671 (citation, internal quotation marks, and brackets omitted).

Here, it is undisputed that the parties submitted to the arbitrator the issue of which substantive law would govern the parties' rights and obligations under the relevant agreements and in the arbitration. (*See* Dkt. No. 1-3, at 36 (Conmed's demand for arbitration seeking a "declaration that the merits of this arbitration, and the parties' rights and obligations under the Subject Agreements shall be determined under New York substantive law"); Dkt. Nos. 1-7, 1-8, 1-9, 1-11, 1-12, 1-13 (the parties' briefing to the arbitrator on the choice-of-law issue); *see* Dkt. No. 43-1, at 45 (Pre-Hearing Scheduling Order No. 1 noting that the parties "contest the substantive law that governs the merits of this arbitration")). Thus, the "sole question" for this Court is "whether the arbitrator[] (even arguably) interpreted the parties' contract, not whether [he] got its meaning right or wrong." *Beijing Shougang Mining Inv. Co.*, 11 F.4th at 161 (citation omitted). The arbitrator's choice-of-law decision quoted the relevant language from the parties' agreement, rejected First Choice's argument that the agreement was unenforceable as a contract of adhesion, engaged in a choice-of-law analysis, considered the strong public policy evidenced by Puerto Rico's Law 75, and rejected Conmed's preemption argument. (*See generally* Dkt. No. 1-5). Thus, regardless of the correctness of the arbitrator's decision that Puerto Rico law

governed the parties' agreement,[17] his choice-of-law decision is at least arguably derived from the parties' agreement and relevant interpretative principles.[18] This is distinguishable from the situation in *Stolt-Nielsen*, where the Supreme Court vacated the decision of an arbitration panel on the ground that the arbitrators exceeded their powers. 559 U.S. at 671–72. There, the arbitration panel "rested its decision" imposing class arbitration on a party's "public policy argument." *Id.* at 672–73. The panel did not "identify[] and apply[] a rule of decision derived from the FAA or either maritime or New York law" and therefore "imposed its own policy choice and thus exceeded its powers." *Id.* at 676–77. Here, by contrast, the arbitrator identified and applied rules of decision derived from New York and Puerto Rican law.

Because the parties unambiguously submitted the issue of which substantive law would govern the arbitration to the arbitrator and the arbitrator's decision falls with his "interpretive authority," *Beijing Shougang Mining Inv. Co.*, 11 F.4th at 161, the Court concludes that the arbitrator did not exceed his powers under Section 10(a)(4). The remainder of Conmed's arguments are more relevant to its "manifest disregard" argument, which the Court considers next.

## C.     Manifest Disregard for Clear and Explicitly Applicable Law

Conmed next argues that the Final Award should be vacated on the ground that the arbitrator manifestly disregarded applicable law. (Dkt. No. 1-25, at 17–27). Specifically,

---

[17] The Court expresses no opinion on the correctness of any of the arbitrator's findings or holdings.

[18] The Court is not persuaded by Conmed's argument that the parties' agreement that any arbitration shall apply the laws of New York is always and necessarily "specifically enforceable under the FAA," without further inquiry. (Dkt. No. 1-25, at 13–14). It is true that parties may "specify by contract the rules under which [an] arbitration will be conducted." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989); *see id.* at 474–76 (declining to disturb the state court's construction of the parties' choice-of-law clause). However, the FAA was designed "to make arbitration agreements as enforceable as other contracts, but not more so." *Id.* at 478 (citation omitted). Conmed has not explained why or how the choice-of-law provision at issue here—which expressly references arbitration proceedings—should be "more" enforceable than what it terms a "garden-variety choice-of-law provision." (Dkt. No. 1-25, at 14).

Conmed argues that the arbitration's decisions to (1) apply Puerto Rico law to the parties'

dispute, (2) find that the 2019 SAL was a release, (3) excuse the existence of "just cause" for

non-payment because of the parties' adoption of a payment plan, and (4) find that First Choice's

noncompliance with the payment plan did not constitute just cause all constitute manifest

disregard for the law. (*Id.*).

To justify vacatur of an arbitration award under the Second Circuit's manifest disregard

standard, a litigant must show three things. First, "the law that was allegedly ignored" by the

arbitrator must be "clear" and "in fact explicitly applicable to the matter before the arbitrator[]."

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (quoting

*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 93 (2d Cir. 2008), *rev'd on other*

*grounds*, 559 U.S. 662 (2010)). "[M]isapplication of an ambiguous law does not constitute

manifest disregard." *Id.* Second, the litigant must show that "the law was in fact improperly

applied, leading to an erroneous outcome." *Id.* Third, it must be shown that the arbitrator knew of

the law's existence "and its applicability to the problem before him," as this subjective

knowledge is required for an arbitrator to "intentionally" disregard the law. *Id.* Demonstrating

manifest disregard of the law is a "heavy burden," and vacatur on such grounds is properly

limited to "those exceedingly rare instances where some egregious impropriety on the part of the

arbitrator is apparent." *Id.* (brackets omitted). Mere "error or misunderstanding with respect to

the law" does not rise to the level of manifest disregard of the law. *Id.*

### 1. Application of Puerto Rico Law

Conmed first argues that the arbitrator's application of Puerto Rican law to the parties'

dispute constitutes a manifest disregard of the law. (Dkt. No. 1-25, at 18–20). Conmed contends

that the arbitrator ignored "well-settled FAA authority dictat[ing] that when the parties[] set forth

ground rules for arbitration, the FAA trumps (pre-empts) any state law policy contradicting those

contractual wishes." (*Id.* at 18–19). First Choice generally responds that the arbitrator's decision to apply Puerto Rico law was correct under federal and New York law and grounded in the interpretation of the parties' contract. (Dkt. No. 47, at 17–23, 38–41, 45).[19]

While not entirely clear, Conmed appears to identify *Volt Information Sciences* and *Concepcion* as the clearly applicable law which the arbitrator ignored. As discussed above, *supra* note 18, the Court does not read *Volt* as holding that an agreement regarding the ground rules for arbitration is always and necessarily enforceable. Conmed therefore has not shown that *Volt* is governing law that is "well defined, explicit, and clearly applicable." *Westerbeke*, 304 F.3d at 209.

In *AT&T Mobility LLC v. Concepcion*, the Supreme Court considered "whether the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures." 563 U.S. at 336. The Concepcions filed a complaint against AT&T in federal court which was consolidated with a putative class action alleging fraud and false advertising. *Id.* at 337. AT&T moved to compel arbitration in accordance with the parties' contract, which required that claims in arbitration be brought in the parties' "individual capacity." *Id.* at 336–37. The district court denied AT&T's motion under California's "*Discover Bank*"[20] rule, which "classif[ied] most collective-arbitration waivers in consumer contracts as unconscionable," and the Ninth Circuit affirmed. *Id.* at 338, 340. The Supreme Court reversed, holding that the *Discover Bank* rule was preempted by Section 2 of the

---

[19] The Court disagrees with First Choice's contention that "federal law determines whether the New York choice-of-law clauses" in the parties' agreement "were enforceable or not." (Dkt. No. 47, at 17–18 (citing *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1917 (2022), and suggesting that federal common law determines the enforceability of the parties' choice-of-law provision)). *Viking River Cruises*'s statement that Section 2 of the FAA "renders agreements to arbitrate enforceable as a matter of federal law," 142 S. Ct. at 1917, simply means that a federal statute— the FAA—provides that such agreements are enforceable. However, "the interpretation of an arbitration agreement is generally a matter of state law." *Stolt-Nielsen*, 559 U.S. at 681 (citations omitted).

[20] *Discover Bank v. Superior Court*, 36 Cal.4th 148 (2005).

FAA. *Id.* at 352; *see* 9 U.S.C. § 2 (providing that covered agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"). The savings clause in Section 2 allows the invalidation of arbitration agreements by "generally applicable contract defenses," but "not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339 (citations omitted). The Concepcions argued that the *Discover Bank* rule was an application of California's general unconscionability doctrine and therefore a ground "exist[ing] at law or equity for the revocation of any contract." *Id.* at 341. The Supreme Court noted, however, that the inquiry is "more complex" when a "doctrine normally thought to be generally applicable" is "alleged to have been applied in a fashion that disfavors arbitration." *Id.*

Ultimately, the Supreme Court concluded that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* at 344. The *Discover Bank* rule interfered with arbitration because, while the rule did not *require* classwide arbitration, it allowed "any party to a consumer contract to demand it *ex post*." *Id.* at 346. Given the important differences between bilateral and class arbitration, "class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, is inconsistent with the FAA." *Id.* at 348; *see id.* at 348–52 (describing the ways in which class arbitration is not "arbitration as envisioned by the FAA" and lacks its benefits).

Conmed argues that *Concepcion* is "directly analogous" to the choice-of-law issue in the present case. (Dkt. No. 1-25, at 14). Conmed argues that Law 75 is analogous to California's *Discover Bank* rule, as it embodies a public policy which renders certain agreements unenforceable. (*Id.* at 15). Conmed further argues that the preemptive scope of the FAA extends

to agreements specifying how an arbitration is to be conducted and under what substantive rules. (*Id.* at 16). First Choice responds that *Concepcion*'s holding is "irrelevant" and that "Law 75 does not cause any structural interference on arbitration like the one cause[d] by the California rule in *Concepcion*." (Dkt. No. 47, at 41).

The Court concludes that Conmed has not shown that *Concepcion* espouses a legal principle whose applicability to the issue before the arbitrator was "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Westerbeke*, 304 F.3d at 209. While the issue decided in *Concepcion* is perhaps, as Conmed argues, "analogous" to the choice-of-law issue here, it is not at all "clear" that the Supreme Court's holding that Section 2 preempted the *Discover Bank* rule is "explicitly applicable." *T.Co Metals*, 592 F.3d at 339. *Concepcion* involved a state rule which, while arguably applicable to "any" contract, nonetheless would have a "disproportionate impact on arbitration agreements" by changing the "fundamental attributes" of arbitration. *Concepcion*, 563 U.S. at 342, 344. Law 75, by contrast, provides that "[a]ny stipulation" requiring a dealer to apply "foreign law or rule of law" is "null and void." P.R. Laws Ann. tit. 10, § 278b-2. Application of this statute has no similarly obvious disproportionate effect on agreements to arbitrate or on the fundamental attributes of arbitration proceedings. (*See* Dkt. No. 1-5, at 5 (arbitrator determining that Law 75 "does not disproportionately apply to arbitration agreements" and distinguishing class action waivers and "substantive non-waivable law")).[21]

---

[21] Furthermore, the fact that the arbitrator distinguished *Concepcion* undercuts any argument that the arbitrator subjectively knew of its "applicability to the problem before him" and therefore "intentionally" disregarded the legal principle. *T.Co Metals*, 592 F.3d at 339.

Accordingly, because Conmed has not shown that the arbitrator ignored clear and explicitly applicable authority, vacatur of the arbitrator's decision that Puerto Rico law applied to the parties' dispute as a manifest disregard of the law is not warranted.

### 2.      Impact of the 2019 SAL

Conmed argues that the arbitrator manifestly disregarded the law by excusing First Choice's conduct as being "released" by the parties' execution of the 2019 SAL, in apparent reliance on a contractual integration clause. (Dkt. No. 1-25, at 20–23). Conmed asserts that a finding that "an integration provision is also a release" is "palpably wrong under Puerto Rican or New York law." (*Id.* at 20). First Choice responds that the arbitrator correctly determined that the parties had resolved their prior disputes by executing the 2019 SAL and that the arbitrator's "factual determination of the parties' contractual intent" is "essentially barred from review." (Dkt. No. 47, at 46).

In assessing whether Conmed had "sufficient bases to terminate its contractual relationship with First Choice, without penalty," the arbitrator stated that the issues of which Conmed complained—including non-payment for products, bounced checks, and customer dissatisfaction—"largely were explained, corrected [and/or] resolved by the time of, or as part of, the 2019 SAL." (Dkt. No. 1-6, at 8–9). The arbitrator then quoted the 2019 SAL's integration clause. (*Id.* at 9 ("This SAL (including the Exhibits, T&C and Warranty Form) and separately agreed purchase targets represent the entire agreement between the parties regarding the subject matter contained herein or therein, and supersede all prior discussions, negotiations and preliminary agreements.")). The arbitrator therefore determined that the issues "ar[ising] prior to the 2019 SAL [were] not determinative." (*Id.*). Separately, when discussing First Choice's failure to comply with the payment plan, the arbitrator also stated that the 2019 SAL "resolved previously unresolved issues." (*Id.* at 10).

27

As an initial matter, it is not clear to the Court that the arbitrator in fact determined that the 2019 SAL constituted a contractual "release," a word which does not appear in the arbitrator's decision.[22] In any event, Conmed has not pointed the Court to "clear" and "explicitly applicable" governing law which the arbitrator intentionally disregarded. (*See* Dkt. No. 1-25, at 20–23). Conmed first cites *Cabrera v. Doval* for the proposition that a release of liability must be stated in "clear, conclusive and unequivocal" terms. 76 D.P.R. 777, 780 (1954). However, *Cabrera* involved a release exculpating the defendants from liability pursuant to Section 4 of the Puerto Rico Civil Code. *See generally id.* Similarly, Conmed cites *Chico v. Editorial Ponce, Inc.* for the proposition that "the language exculpating from liability for [some liable act] should be explicit, either expressly referring to [the liable act] or indicating the intention in unequivocal terms." 101 D.P.R. 759, 778–79 (1973). However, *Chico* likewise involved a forward-looking exculpatory clause under Section 4, and the Supreme Court of Puerto Rico held that the clause at issue was contrary to the public interest. *Id.* Neither case involves a release from liability for an already existing claim or potential claim, and First Choice cites authority which appears to be more applicable. Puerto Rico law refers to the release or settlement of a claim as a "compromise." *Ruiz-Sanchez v. Goodyear Tire & Rubber Co.*, 717 F.3d 249, 252 (1st Cir. 2013) (citing P.R. Laws Ann. tit. 31, § 4821). An "extrajudicial compromise" is a compromise "entered either 'before the commencement of an action' or 'without the court's intervention.'" *Id.* at 252–53 (citation omitted). The release or settlement of a claim requires (1) "an uncertain legal relationship," (2) an intent to eliminate the uncertainty," and (3) "reciprocal concessions." *Id.* at 253 (citation and brackets omitted).

---

[22] Nor have the parties made clear the relationship, if any, between a contractual release of liability and the existence or non-existence (or excusing) of just cause to terminate a dealer's contract under Law 75.

Given that the caselaw on which Conmed relies is distinguishable, Conmed has not met its "heavy burden" of showing that the arbitrator subjectively knew of the applicability of those cases to the issue before him and intentionally disregarded the law. *T.Co Metals*, 592 F.3d at 339. Indeed, the Court finds that the most plausible reading of the arbitrator's decision is that, notwithstanding the potential existence of just cause to terminate the parties' relationship prior to 2019, Conmed affirmatively entered into a new agreement—the 2019 SAL—which reauthorized First Choice to sell certain products in Puerto Rico and effectively created a new relationship between the parties which would require its own just cause to terminate.

### 3.     Excusing Existence of "Just Cause" for Non-Payment Due to Payment Plan

Conmed next argues that the arbitrator acted in manifest disregard of the law by excusing the existence of just cause based on First Choice's history of non-payment because the parties agreed to a payment plan for the accrued debt. (Dkt. No. 1-25, at 23–27). Conmed asserts that well-settled law applying Law 75 rejects the notion that a supplier's agreement to a payment plan excuses or negates the existence of just cause. (*Id.*). First Choice responds that the arbitrator correctly determined that its late payments did not constitute just cause and that his finding is a factual one for which judicial review is essentially foreclosed. (Dkt. No. 47, at 46–47).

The arbitrator recognized that Law 75 "provides that the failure to pay for product received constitutes just cause for termination of a distribution agreement." (Dkt. No. 1-6, at 10 (citing *Greenville Funeral Supply, LLC v. Rockvale, Inc.*, 597 F. Supp. 2d 241 (D.P.R. 2008))).[23] As Conmed notes, the arbitrator also acknowledged that, "[o]ver time, First Choice did not pay

---

[23] While not explicitly stated in the Final Award, the arbitrator apparently found that timely payment for goods constituted an essential obligation of the parties' agreement. *See, e.g.*, *Greenville Funeral Supply*, 597 F. Supp. 2d at 245 ("Although the determination of just cause depends on the facts of each case, courts consistently have held that regularly paying for goods on time normally is one of the essential obligations of the dealer's contract, and that a dealer's failure to meet this obligation constitutes just cause for termination." (collecting cases)).

for Products that it purchased from Conmed." (*Id.* at 5). However, the arbitrator also found that "the non-payment for Products occurred in 2017 and earlier and ceased to accrue by the time of the 2019 SAL," and that the 2019 SAL "resolved previously unresolved issues and provided a payment plan to address the arrearages going forward." (*Id.* at 8, 10). The arbitrator therefore focused on First Choice's compliance with the payment plan. *See infra* Section V.C.4.

Conmed primarily cites two cases to support its argument that a supplier's cooperation with a distributor in accepting late payments or agreeing to a payment plan does not negate the existence of just cause. (Dkt. No. 1-25, at 25–26).[24] In *Waterproofing Systems, Inc. v. Hydro-Stop, Inc.*, the First Circuit found "troubling" the magistrate judge's conclusion that because the supplier, Hydro-Stop, "had not previously terminated the Distribution Agreement because of late payment, it could not suddenly change course" without violating Law 75. 440 F.3d 24, 29 (1st Cir. 2006). The court noted that a supplier may be "willing to overlook the untimely payments" at first, but "it [is] quite possible that there [i]s a limit to the supplier's patience." *Id.* Requiring that suppliers "terminate distribution agreements immediately upon distributors' failure to pay timely, or risk being forever banned from so doing," is "contrary to the principle enshrined in Law 75." *Id.* at 30.

Second, Conmed cites *Tatan Management v. Jacfran Corp.*, 270 F. Supp. 2d 197 (D.P.R. 2003). There, the district court held there was no evidence "to suggest that the conduct between the parties tacitly altered the terms of payment as to excuse Plaintiffs' untimely performance." *Id.* at 203 ("That [the suppliers] tolerated due balances and attempted to resolve the dispute amicably through reasonable payment plans does not mean that they altered the terms and

---

[24] Conmed's memorandum of law on this point is virtually identical to the brief it submitted to the arbitrator. (Dkt. No. 1-20, at 33–34).

somehow excused Plaintiffs' timely performance."). However, the parties had expressly altered the terms of payment for merchandise, and the court found that the plaintiffs breached those agreements on two occasions. *Id.* Because the plaintiffs engaged in a "pattern of broken promises and breached agreements," the court found that the suppliers had just cause to terminate the relationship. *Id.* at 204; *see also Casco Sales Co., Inc. v. Maruyama U.S., Inc.*, 901 F. Supp. 2d 311, 320–21 (D.P.R. 2012) (rejecting the argument that the supplier "waived its right to terminate the Agreement" by accepting late payments and continuing to sell product to the distributor, and noting that the distributor "returned to its old habits" and accumulated debt owed even with the supplier's cooperation).

The Court concludes that the authority cited by Conmed is distinguishable and therefore not "clear" and "explicitly applicable" to the issue before the arbitrator. First, the Court does not read the arbitrator's decision as simply dismissing or excusing First Choice's history of non-payment for products. Unlike cases involving a history of untimely payments which the supplier attempts to cooperate with the distributor to resolve, as in *Waterproofing Systems*, here the parties affirmatively entered into a new agreement with the execution of the 2019 SAL, the terms of which set forth a payment plan to reduce First Choice's accumulated debt, and a new arrangement in the summer of 2020 which reduced First Choice's monthly payments to $3,000. Conmed has not pointed to authority which would require the arbitrator to ignore these contractual terms and whether or not First Choice breached them. Indeed, in *Tatan Management*, the court did not end its analysis with whether the distributor violated the original terms of the parties' agreement, but considered whether the distributor also violated the modified terms to which the parties subsequently agreed. Because the distributor did violate the agreed-to payment plans and engaged in a "pattern of broken promises," the court found just cause.

Conmed has not cited to any case where a court found just cause where the distributor complied with expressly altered payment terms. Therefore, the Court finds that the arbitrator did not manifestly disregard the law in considering whether or not First Choice complied with the terms of the payment plan. *See Waterproofing Sys.*, 440 F.3d at 29 (noting that the "issue of just cause under Law 75 is a question of fact").

### 4.    Excusing Breach of the Payment Plan

Finally, Conmed argues that arbitrator manifestly disregarded the law by "ignor[ing] the legal effect of the undisputed breach by First Choice of the payment plan that was put in place in the 2019 SAL" because he found that "non-compliance" occurred but that the "shortfall" was insufficient to warrant termination of the parties' relationship. (Dkt. No. 1-25, at 27). First Choice responds that the de minimis amount which the arbitrator found it owed to Conmed is a minor breach or infraction which is not regarded as just cause. (Dkt. No. 47, at 47).

The arbitrator found that First Choice had "underpaid Conmed from the date of the 2019 SAL through October 25, 2021—almost three years—the amount of $750.00." (Dkt. No. 1-6, at 11). He further found that this underpayment did "not warrant termination of the contractual relationship between the Parties." (*Id.*). Conmed does not challenge the arbitrator's factual findings in its petition, and the Court therefore accepts for purposes of this decision the finding that, under the terms of the payment plan, First Choice underpaid by $750. While Conmed cites caselaw in which the court determined that the "credit limit and payment term" in the parties' agreement were essential obligations, *see Greenville Funeral Supply*, 597 F. Supp. 2d at 246–47, Conmed has not cited any authority for the proposition that a de minimis underpayment constitutes just cause to terminate as a matter of law, and the "issue of just cause under Law 75 is a question of fact." *Waterproofing Sys.*, 440 F.3d at 29. The Court therefore will not review the arbitrator's determination that, under all of the circumstances, First Choice's $750 underpayment

32

did not warrant termination of the parties' relationship. *See Westerbeke Corp.*, 304 F.3d at 214

("The arbitrator's factual findings and contractual interpretation are not subject to judicial

challenge, particularly on our limited review of whether the arbitrator manifestly disregarded the

law." (citations omitted)); *ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.*, 102 F.3d

677, 687 (2d Cir. 1996) (noting that "the mere fact that an arbitrator erroneously decides the facts

is not a ground for vacating the award").

     In sum, Conmed has not met its "heavy burden" of demonstrating manifest disregard of

the law, and the Court concludes that this is not one of one of "those exceedingly rare instances

where some egregious impropriety on the part of the arbitrator is apparent." *T.Co Metals.*, 592

F.3d at 339 (brackets omitted). The Court therefore denies Conmed's petition to vacate the

arbitration award.

## VI.    FIRST CHOICE'S CROSS-PETITION TO CONFIRM

     Having denied the petition to vacate, the Court must confirm the arbitration award. *See* 9

U.S.C. § 9 (providing that, upon a party's application, "the court must grant [an order confirming

the arbitration award] unless the award is vacated, modified, or corrected as prescribed [9 U.S.C.

§§ 10, 11]"); *D.H. Blair & Co.*, 462 F.3d at 110 ("[T]he court 'must grant' the award 'unless the

award is vacated, modified, or corrected.'" (quoting 9 U.S.C. § 9)). Because there is a "barely

colorable justification" for the outcome reached by the arbitrator, *D.H. Blair & Co.*, 462 F.3d at

110, the Court confirms the Final Award and reduces it to a judgment.

     First Choice also argues in its cross-petition that it is entitled to recover attorney's fees

and costs under Law 75. (Dkt. No. 47, at 30–31). Section 7 of Law 75 provides: "In every action

filed pursuant to the provisions of this chapter, the court may allow the granting of attorney's

fees to the prevailing party, as well as a reasonable reimbursement of the expert's fees." P.R.

Laws Ann. tit. 10, § 278e. However, First Choice has provided no authority to support its

contention that "the instant legal action is an action 'filed pursuant to the provisions' of Law 75," (Dkt. No. 47, at 31); nor has the Court found any. In any event, "an award of attorneys' fees under Law 75 is within the district court's discretion," *B. Fernandez & HNOS, Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 28 n.7 (1st Cir. 2008), and, considering all of the facts and circumstances here, including the fact that First Choice did not have to file an action to enforce Law 75 and the parties' relationship has continued, the Court would decline in its discretion to award First Choice attorney's fees.

## VII.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Conmed Corporation's Petition to Partially Vacate an Arbitration Award (Dkt. No. 1) is **DENIED**; and it is further

**ORDERED** that First Choice Prosthetic & Orthopedic Service, Inc.'s Cross-Petition to Confirm the Arbitration Award (Dkt. No. 43) is **GRANTED**; and it is further

**ORDERED** that the Clerk of Court is directed to enter judgment confirming the Final Award (Dkt. No. 1-6) and close this case.

**IT IS SO ORDERED.**

Dated: <u>January 11, 2023</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge